Cheryl A. WRIGHT, Plaintiff-Respondent-Cross Appellant,

v.

MERCY HOSPITAL OF JANESVILLE, WISCONSIN, INC. and Wisconsin Hospital Association Liability Insurance Plan, Defendants-Appellants-Cross Respondents. †

Court of Appeals

*No. 95–2289. Submitted on briefs September 6, 1996.—Decided November 14, 1996.*

(Also reported in 557 N.W.2d 846.)

† Petition to review denied.

453

For the plaintiff-respondent-cross appellant the cause was submitted on the briefs of *John C. Carlson* and *Steven J. Schooler* of *Lawton & Cates, S.C.* of Madison.

For the defendants-appellants-cross respondents the cause was submitted on the brief of *Robert G. Krohn* of *Roethe, Krohn & Pope* of Edgerton.

Before Eich, C.J., Dykman, P.J., and Deininger, J.

DEININGER, J. Mercy Hospital and its insurer appeal from a judgment awarding Cheryl Wright damages for medical malpractice and from an order awarding her reasonable attorney fees. Wright cross-appeals the trial court's reduction of damages for economic loss. We conclude that the trial court properly exercised its discretion in fashioning the special verdict, in making certain evidentiary rulings, and in

denying Mercy's late request for leave to file a cross-claim. We further conclude that the trial court properly applied the law in interpreting a pretrial settlement agreement and in awarding reasonable attorney fees under § 51.61, STATS. Thus, we affirm the judgment and order. Similarly, because we find the trial court properly applied the law in dismissing Wright's claim for damages based upon "wrongful divorce," we affirm the reduction of the jury's award for economic loss.

## BACKGROUND

Cheryl Wright was intermittently treated for psychological and psychiatric disorders for a number of years. Her problems apparently originated during childhood and adolescence when she was sexually abused. She was admitted as a psychiatric patient at Mercy Hospital in January and February of 1992. She was thirty-three years old, married, and the parent of two minor children. Wright's diagnosis included depression, posttraumatic stress disorder, suicidal ideation and personality disorder.

Mercy had contracted with CCHP, an enterprise which supplies registered nurses on a temporary basis, for the services of Shirley Connelly. CCHP administered Connelly's payroll, but Mercy supervised her professional duties. During Wright's hospitalization, Connelly developed a relationship with Wright which culminated in several sexual encounters following Wright's discharge. Shortly thereafter, Wright filed for a divorce and it was granted in December 1992. The court awarded joint custody of the children, with primary physical placement to Wright's husband.

Wright commenced this action against Connelly, Mercy, CCHP and their respective insurers, alleging professional malpractice in the treatment she received

while at Mercy Hospital. Wright alleged that Connelly had mishandled the transference-countertransference phenomenon, a process in which a mental health patient develops a psychological dependence on a care provider, and the provider responds in kind. She claimed that Mercy was negligent both as Connelly's employer and because Mercy's other employees failed to properly detect and manage the transference-countertransference between Wright and Connelly.

Just prior to trial Wright settled with CCHP, its insurer and Connelly. The agreement fully released CCHP and its insurer, but released Connelly only to the extent of her liability for conduct within the scope of her employment with CCHP. Wright also reserved her right to pursue liability claims against other persons or entities for the allegedly improper treatment Wright received during her hospitalization. The trial court dismissed Connelly, CCHP and its insurer from the suit. Mercy did not file a cross-claim against Connelly, CCHP, or its insurer for "strategic purposes." Connelly's only participation in the trial was as a witness.

At trial, Wright produced evidence that other Mercy employees had concerns regarding the interactions between Connelly and Wright, some of which were noted in hospital charts. Wright's supervising psychiatrist testified that signs of "transference/countertransference" are matters of concern in treating patients for mental health disorders, and that corrective action would have been taken had the matter been reported. The jury found both Connelly and Mercy to be causally negligent, apportioned negligence seventy-five percent to Connelly and twenty-five percent to Mercy and found that Connelly's negligence was not within the scope of her employment. It awarded

$35,000 for past and future physical and emotional pain and suffering, nothing for interference with her family relationships, $350,000 for past and future economic loss and $75,000 for past and future medical expenses. The jury also assessed $250,000 in punitive damages against Connelly. The conduct of Mercy's other employees was found not to be outrageous.

The parties agreed that the court could rule after verdict on the application of § 51.61, STATS., to the action. The trial court concluded that the statute applied to the action and awarded Wright reasonable attorney fees of $123,783.75 and costs of $50,444.80. The court denied Mercy's motion for a new trial and its other post-verdict motions save one. It reduced the jury's award for past and future economic loss from $350,000 to $10,000, concluding that almost all of the economic damages were based upon an impermissible claim for wrongful divorce.

Additional facts will be discussed below.

## THE SETTLEMENT AGREEMENT AND DENIAL OF LATE CROSS-CLAIM

Mercy argues that the trial court should have interpreted the pretrial settlement agreement as a full *Pierringer* release with respect to Connelly. Had it done so, the share of causal negligence apportioned to Connelly would be imputed to Wright. *Pierringer v. Hoger*, 21 Wis. 2d 182, 193, 124 N.W.2d 106, 112 (1963).

■■

The agreement on its face, however, is a *Pierringer* release only as to CCHP and its insurer. As to Connelly, it is only a partial release, releasing her from liability for her conduct which might be determined to be within the scope of her employment with CCHP.

Connelly was not released from liability for her actions within the scope of employment for Mercy or for actions outside the scope of employment. With respect to these remaining avenues of Connelly's liability, the agreement is a covenant not to sue. *See Loy v. Bunderson*, 107 Wis. 2d 400, 420, 320 N.W.2d 175, 186-87 (1982). The trial court found "that is what it intended to do and it did." We agree. "Releases should be construed to give effect to the intention of the parties. . . . The determination of the intent of the parties to a release is a question of fact and will be upheld unless clearly erroneous." *Brandner v. Allstate Ins. Co.*, 181 Wis. 2d 1058, 1078, 512 N.W.2d 753, 762-63 (1994) (citations omitted).

CCHP, its insurer, Connelly and Wright took great pains to declare their intent in the settlement agreement that Connelly remain fully exposed to all claims of other parties for her acts aside from those determined to be within the coverage of CCHP's insurer. The agreement: (1) explicitly recognized Connelly's potential liability for contribution to Mercy; (2) specifically applied the *Pierringer* release only to CCHP and its insurer; and (3) declared that it did not "release Connelly from her own, direct liability . . . or from the liability Connelly has or might have . . . for the acts or omissions, negligent or otherwise, committed by her or any other responsible party to the extent she was acting outside the scope of her employment with CCHP and [outside the scope of coverage by CCHP's insurer]."

Since the jury found Connelly to be seventy-five percent causally negligent, Mercy has a right to pursue contribution from Connelly for her proportionate share of the damages assessed by the jury. This result is no different than if there had been no settlement agreement. As in *Loy*, this agreement totally releases some

defendants while releasing another defendant from part but not all liability. We conclude there is "no fundamental unfairness in this agreement." *Loy*, 107 Wis. 2d at 418, 320 N.W.2d at 185. Allowing plaintiffs to settle with some parties while preserving causes of action against others is desirable because it fosters effective and expeditious resolution of lawsuits. *Brandner*, 181 Wis. 2d at 1072, 512 N.W.2d at 760.

Pursuant to the settlement agreement, Connelly, CCHP and its insurer were dismissed prior to trial. The "strategic purposes" for which Mercy had not cross-claimed against Connelly were apparently still valid at the time the court accepted the partial settlement agreement. Mercy did not request leave to file a cross-claim against Connelly until it filed post-verdict motions. The court denied Mercy's request.

It is within a trial court's discretion to allow amendment of pleadings until and even after judgment, but a late amendment may not unfairly deprive an adverse party of the opportunity to contest the issues raised by the amendment. *Soczka v. Rechner*, 73 Wis. 2d 157, 162, 242 N.W.2d 910, 913 (1976). We cannot say the trial court's denial of Mercy's motion to cross-claim against Connelly after a two-week trial in which Connelly had appeared only as a witness was unreasonable. *See Burkes v. Hales*, 165 Wis. 2d 585, 590, 478 N.W.2d 37, 39 (Ct. App. 1991).

Mercy may still pursue its claim for contribution or indemnity against Connelly. Mercy relies on *Fleming v. Threshermen's Mutual Insurance Co.*, 131 Wis. 2d 123, 388 N.W.2d 908 (1986), to argue that contribution or indemnity should be resolved as part of this litigation. In *Fleming*, the supreme court held that the failure of a nonsettling defendant to file a cross-claim is of no con-

sequence when the liability of a settling defendant is imputed to the plaintiff because of a *Pierringer* release of a settling defendant. *Id.* at 128, 388 N.W.2d at 910. There, the settling defendant had obtained a full *Pierringer* release of liability, including intentional acts liability. Here, Connelly's release was partial and limited only to actions found to be within the scope of her employment with CCHP.[1] She was not released from liability for her conduct which formed the basis of the jury verdict. Her percentage of liability for damages was not therefore imputable to Wright, and *Fleming* is inapposite.

Finally, Mercy argues that issue preclusion entitles it to a judgment for contribution from Connelly without relitigating the negligence and apportionment issues. Had Mercy wished to preserve its right to seek a judgment for contribution in this action, it could have done so with a timely filed cross-claim. The availability of issue preclusion to Mercy can as well be determined in a separate action as in this one.

## SPECIAL VERDICT

Mercy claims error because "the liability issues were not appropriately presented to the jury." First, it argues that the special verdict assumed, without asking, that Connelly engaged in inappropriate conduct toward Wright during the latter's hospitalization. Wright responds that Mercy waived this alleged error in the verdict form by failing to object at the instruc-

[1] The trial court ruled that Connelly was the servant of Mercy, not CCHP, for purposes of respondeat superior. It declined to include a verdict question as to whether Connelly was acting within the scope of her employment with CCHP. Mercy does not appeal the court's ruling on this issue.

tions conference. The following colloquy on this issue occurred during the verdict conference:

> THE COURT: What I suggest is let's just use straight negligence, was the hospital negligent in providing care to Cheryl Wright. If it was such negligence, cause of injuries, was Shirley Connelly negligent in providing care, was such negligence a cause of Cheryl Wright's injuries. We'll have a question on whether or not she is acting within her scope of her employment. We all agree that has to be in there someplace.

> MR. CARNEY [Mercy's co-counsel]: I think that makes the most sense, that way of going about it.

> THE COURT: You can argue whatever you want, negligence, because they will have the definition of negligence here. We'll get to that in a minute. But gives you—either way you look at it, you're presuming—we'll go through the ultimate fact question leading up to what is such negligence and I want to avoid that.

> MR. KROHN [Mercy's co-counsel]: Okay. So you're saying, if I understood you, by asking the negligence questions if they answer no, it could be for the reason they believe nothing went wrong in the hospital. In terms of maybe they even concluded there wasn't even a relationship developing.

> THE COURT: Correct.

> MR. CARNEY: I think that's the most reasonable.

> MR. KROHN: I don't have any problem with that.

"Failure to object at the conference constitutes a waiver of any error in the proposed . . . verdict." Section 805.13(3), STATS. If counsel fails to object to the form of

the special verdict, the trial court does not have an opportunity to correct the error and submit a proper verdict question to the jury. *Vollmer v. Luety*, 156 Wis. 2d 1, 11, 456 N.W.2d 797, 802 (1990). In the absence of a specific objection which brings into focus the nature of the alleged error, a party has not preserved its objections for appeal. *See id.* at 10, 456 N.W.2d at 801; *Hauer v. Union State Bank of Wautoma*, 192 Wis. 2d 576, 601, 532 N.W.2d 456, 465 (Ct. App. 1995). Mercy failed to preserve any error regarding whether the negligence questions fairly presented Connelly's conduct to the jury. Thus, we may not consider the issue.

Second, Mercy argues that the trial court incorrectly denied its request for a question regarding Wright's contributory negligence. We disagree. It is well established that "[t]he form of a special verdict is addressed to the discretion of the trial court." *Zintek v. Perchik*, 163 Wis. 2d 439, 454, 471 N.W.2d 522, 527 (Ct. App. 1991). In support of its request, Mercy argues that a mentally ill person is held to the same standard of care as the average person. *See Burch v. American Family Mut. Ins. Co.*, 198 Wis. 2d 465, 473–74, 543 N.W.2d 277, 280 (1996). But *Burch* does not apply to the facts of this case. There, the issue was whether a mentally retarded fifteen-year-old girl was incapable of negligence. The supreme court held that the reasonable person standard applied despite the girl's disability. The act of negligence, however, involved operating an automobile, not the girl's conduct while a patient receiving care and treatment for her disability.

The trial court summarized its reasoning in rejecting a contributory negligence question with this query, "How can a patient negligently receive treatment?" We agree with Wright that *Gould v. American*

*Family Mutual Insurance Co.*, 198 Wis. 2d 450, 543 N.W.2d 282 (1996), supports the trial court's rejection of a contributory negligence question: "[A] person institutionalized, as here, with a mental disability, and who does not have the capacity to control or appreciate his or her conduct cannot be liable for injuries caused to caretakers who are employed for financial compensation." *Id.* at 463, 543 N.W.2d at 287.

Finally, Mercy alleges that the trial court erroneously exercised its discretion by not allowing the jury to determine whether Connelly's conduct was negligent or intentional. The jury apportioned seventy-five percent of the causal negligence to Connelly, determined that Connelly was not acting within the scope of her employment, found that her conduct was "outrageous," and assessed $250,000 in punitive damages against her. Mercy argues that the jury would likely also have found Connelly's conduct to have been intentional rather than negligent, had that been an option.

██ Mercy posits that it would, therefore, be entitled to 100% indemnification from Connelly, citing *Fleming v. Threshermen's Mutual Insurance Co.*, 131 Wis. 2d 123, 130, 388 N.W.2d 908, 911 (1986).[2] If Mercy wishes to pursue Connelly for indemnification instead of seventy-five percent contribution, it may do so. Whether Connelly's allegedly improper conduct toward Wright was negligent or intentional was of no consequence to Wright's claim against Mercy. Mercy had the opportunity to pursue this issue with a timely cross-claim for indemnification against Connelly in this action. The

---

[2] In *Fleming v. Threshermen's Mutual Insurance Co.*, 131 Wis. 2d 123, 130, 388 N.W.2d 908, 911 (1986), the supreme court held that a negligent tortfeasor has a right to indemnification from a joint tortfeasor who acted intentionally.

prospect of separate litigation against Connelly is the price Mercy tacitly agreed to pay for whatever strategic benefits it derived from not cross-claiming against Connelly prior to trial.

In fashioning the verdict, the trial court "looked to and considered the facts of the case and reasoned its way to a conclusion that is (a) one a reasonable judge could reach and (b) consistent with applicable law." *Burkes v. Hales*, 165 Wis. 2d 585, 590, 478 N.W.2d 37, 39 (Ct. App. 1991) (footnote omitted). It therefore did not erroneously exercise its discretion, and we affirm its rulings as to the form of verdict.

## EVIDENTIARY ISSUES

Mercy claims that it is entitled to a new trial because the trial court improperly: (1) allowed the jury to hear testimony regarding Wright's damaged family relationships; (2) allowed the jury to hear improper evidence and argument because a punitive damages question regarding Mercy's conduct was included in the verdict; and (3) allowed Wright's expert psychologist to testify as to hospital standards of care despite her previous statement that she would not do so. In reviewing evidentiary issues, the question is not whether this court would have permitted the evidence, but whether the trial court appropriately exercised its discretion. *State v. Alsteen*, 108 Wis. 2d 723, 727, 324 N.W.2d 426, 428 (1982).

Mercy argues that extensive testimony from Wright, her friends and relatives regarding Wright's damaged family relationships "tainted" the verdict because the jury was swayed by emotion in awarding the sums it did for emotional pain and suffering, medical expense and economic loss. Mercy's argument is

similar with respect to the punitive damages question relating to the conduct of its employees. It maintains there was no evidence to support a punitive damages claim against Mercy, but including the question allowed Wright's counsel to inflame the jury with arguments about Mercy's "outrageous" conduct, again influencing the jury's answers to the negligence and damage questions.

We reject both contentions. The difficulty with Mercy's claims of prejudicial impact on the jury is that the jury awarded Wright nothing in damages for "interference with her family relationships, past and future," and found that the conduct of Mercy's employees was *not* "outrageous." The verdict itself demonstrates that the jury was not swayed by the evidence and arguments cited by Mercy. Since the jury showed itself capable of distinguishing between degrees of culpable conduct and among elements of damages, we cannot conclude that its awards for pain and suffering and medical expense were tainted by improper evidence or argument. As we discuss below, we affirm the trial court's reduction of the jury's award for economic loss. Any impact on the jury's economic loss award from evidence relating to damaged family relationships is therefore eliminated.

Mercy's final evidentiary objection is to certain testimony of Carol Moresco-Goniu, a psychologist who testified as to her care and treatment of Wright. She also offered opinions as to Mercy's standard of care. Mercy claims it was misled because at an earlier deposition Moresco-Goniu had stated she would testify as to her treatment of Wright but not as an "expert witness." Wright had, however, listed her as an expert witness

pursuant to a pretrial scheduling order. The trial court determined there had been no violation of the pretrial order and that Mercy had available for trial two experts on its standard of care to counter Moresco-Goniu's testimony. The court thus concluded that any surprise to Mercy's counsel was not prejudicial. We find no basis to disagree. "We will not reverse a discretionary determination by the trial court if the record shows that discretion was in fact exercised and we can perceive a reasonable basis for the court's decision." *Prahl v. Brosamle*, 142 Wis. 2d 658, 667, 420 N.W.2d 372, 376 (Ct. App. 1987).

## SECTION 51.61, STATS.; ATTORNEY FEES

The trial court concluded that, given the jury's finding of causal negligence, Mercy failed to provide Wright adequate treatment within the meaning of § 51.61(1)(f), STATS.[3] It awarded her attorney fees of

---

[3] Section 51.61, STATS., provides in relevant part:

**51.61 Patients rights. (1)** In this section, "patient" means any individual who is receiving services for mental illness, developmental disabilities, alcoholism or drug dependency, including any individual who is admitted to a treatment facility in accordance with this chapter . . . [i]n private hospitals and in public general hospitals, "patient" includes any individual who is admitted for the primary purpose of treatment of mental illness, developmental disability, alcoholism or drug abuse . . . . Except as provided in sub. (2), each patient shall:

. . . .

(f) Have a right to receive prompt and adequate treatment, rehabilitation and educational services appropriate for his or her condition . . . .

. . . .

(7)(a) Any patient whose rights are protected under this section who suffers damage as the result of the unlawful denial or violation of any of these rights may bring an action against the person, including the state or any political subdivision thereof, which

$123,783.85 and costs of $50,440.30 under § 51.61(7)(a). The fees were based upon hourly rates and an itemization of hours submitted by Wright's attorneys. The trial court found both the fees and costs were reasonable for the preparation and prosecution of the case.

Mercy, citing *Erbstoeszer v. American Casualty Co.*, 169 Wis. 2d 637, 486 N.W.2d 549 (Ct. App. 1992), first argues that § 51.61, STATS., does not apply because to do so holds Mercy to a higher standard of care than is required of health care providers under the law of negligence, thus subjecting Mercy to "absolute liability."[4]

Construction of a statute, or its application to a particular set of facts is a question of law, which we decide independently, owing no deference to the trial court's determination. *Minuteman, Inc. v. Alexander*, 147 Wis. 2d 842, 853, 434 N.W.2d 773, 778 (1989). We said in *Erbstoeszer* that we saw "no indication that the legislature intended to apply a higher standard of care in negligence actions by virtue of sec. 51.61(1)(f), Stats." *Erbstoeszer*, 169 Wis. 2d at 643 n.1, 486 N.W.2d at 552. We fail to see how applying the statute in this case brings about such a result. The jury was given traditional negligence and medical malpractice

---

unlawfully denies or violates the right in question. The individual may recover any damages as may be proved, together with exemplary damages of not less than $100 for each violation and *such costs and reasonable actual attorney fees as may be incurred.*

(Emphasis added).

[4] Mercy also implies that § 51.61, STATS., should not apply to it and its insurer because they are corporations. This argument is not developed, however, and we therefore do not address it. *See Reiman Assocs. v. R/A Advertising, Inc.*, 102 Wis. 2d 305, 306 n.1, 306 N.W.2d 292, 294 (Ct. App. 1981).

instructions patterned on WIS J I—CIVIL 1005 and 1023. It found Mercy negligent in providing treatment to Wright. The trial court determined that the negligence verdict was supported by the evidence at trial and concluded that Mercy failed to provide adequate treatment for Wright's mental illness:

> Every step along the way that I have outlined here I believe the jury felt, and I agree, the employees of Mercy Hospital and those in supervision had a responsibility to do something other than not read the chart, other than ignore the conduct. That was the failure of treatment.
>
> What Ms. Connelly did was wrong. What the supervisors and psychiatrists did compounded that wrong and permitted that wrong to affect the treatment. That was the failure [o]f Mercy Hospital to provide prompt and adequate treatment.

The negligence claim in *Erbstoeszer* was based on a fall while the patient was being taken for a walk. We distinguished the issue of whether the nurse exercised due care and proper judgment in allowing the patient to go for a walk from the "treatment techniques employed by the hospital and its staff 'to bring about [the patient's] rehabilitation.' " *Erbstoeszer*, 169 Wis. 2d at 643, 486 N.W.2d at 552. Here, however, the treatment techniques or deficiencies of Mercy's staff are part and parcel of the negligence claim tried to the jury. The trial court properly applied § 51.61(7)(a), STATS., to award Wright her costs and reasonable attorney fees.[5]

---

[5] Mercy also argues that "enforcement" of § 51.61, STATS., against a hospital which was only 25% negligent is "contrary to public policy." This argument is better addressed to the legislature than to this court. *See Madison Teachers, Inc. v. Madison*

Next, Mercy argues that the fee award should be discounted because of a contingency fee agreement between Wright and her attorneys, and that the award should be apportioned between Mercy and Connelly.[6] Neither contention has merit.

Our standard of review of a circuit court's determination of attorney fees is deferential. *See Village of Shorewood v. Steinberg*, 174 Wis. 2d 191, 204, 496 N.W.2d 57, 62 (1993). In making a determination as to the reasonableness of attorney fees, a circuit court may consider the factors listed in SCR 20:1.5 (West 1995), the first of which includes "the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly." *See id.*; SCR 20:1.5(a)(1). These are the primary factors the trial court cited in awarding $123,000 in fees based upon Wright's counsel's itemized billings.

The Supreme Court has endorsed the application of prevailing billing rates to the hours reasonably expended on successful claims as the "centerpiece of attorney's fee awards" in federal civil rights actions. *Blanchard v. Bergeron*, 489 U.S. 87, 94 (1989). The *Blanchard* court specifically rejected the limitation of an award to the amount provided in a plaintiff's contingent fee agreement with counsel. *Id.* at 93. The Wisconsin Supreme Court has expressed a similar view. *Thompson v. Village of Hales Corners*, 115 Wis. 2d 289, 312, 340 N.W.2d 704, 715 (1983) ("We . . .

---

*Metro. Sch. Dist.*, 197 Wis. 2d 731, 755, 541 N.W.2d 786, 796 (Ct. App. 1995).

[6] Mercy makes no claim that the trial court erred in its finding that the fees and costs submitted by Wright's counsel were not excessive for the work performed.

disapprove the reduction of fees based on the existence of a contingent fee arrangement."). While the *Blanchard* court relied, in part, on an analysis distinguishing federal civil rights claims from personal injury litigation, *Blanchard*, 489 U.S. at 96, the policy considerations behind § 51.61(7)(a), STATS., are similar to attorney fee provisions in federal civil rights legislation: to encourage meritorious claims on behalf of mental health patients regardless of the size of monetary damages that may be proven. As the trial court noted, "generally these cases don't end up in large amounts as this case did not end up in a large amount of damages. $120,000."

We conclude that the trial court did not erroneously exercise its discretion by refusing to reduce the fee award because of the contingent fee contract. Nor was it error for the trial court to refuse to reduce or apportion the fee award because of the claims against Connelly. Notwithstanding the jury's verdict that Connelly acted outside the scope of her employment with Mercy, proof of Connelly's conduct toward Wright was inextricably intertwined with Wright's claim against Mercy. A losing party is not entitled to a reduction in attorney fees for time spent by opposing counsel on unsuccessful claims, if the winning party was substantially successful and the claims were made in good faith. *See Radford v. J.J.B. Enters., Ltd.*, 163 Wis. 2d 534, 550, 472 N.W.2d 790, 797 (Ct. App. 1991). Furthermore, where defendants are jointly and severally liable for compensatory damages, they may also be held jointly and severally liable for any attorney fees awarded. *Id.* at 549, 472 N.W.2d at 796.

Wright requests in a footnote to her brief that we direct on remand that reasonable appellate attorney

fees be determined and awarded to her. We agree and so direct.[7] The trial court is to determine and award Wright reasonable appellate attorney fees as can be shown to be related to her response to issues raised in Mercy's appeal and not related to her unsuccessful cross-appeal.

## CROSS-APPEAL: REDUCTION IN ECONOMIC LOSS AWARD

The jury awarded Wright $350,000 for "economic loss, past and future." Evidence on economic loss came from a licensed psychologist engaged in providing vocational rehabilitation services. He testified to projections of Wright's diminished standard of living due to the loss of "consumptive benefit" from her being single as opposed to being married to her former husband through his retirement. He compared the share of the combined incomes of both persons from which Wright would benefit for her individual and "indivisible" needs had the marriage continued, to Wright's sole

---

[7] In *Shands v. Castrovinci*, 115 Wis. 2d 352, 357–59, 340 N.W.2d 506, 508–09 (1983), the supreme court held that a tenant who suffered pecuniary loss because of a landlord's violation of WIS. ADM. CODE § AG 134 "shall recover reasonable attorney fees for appellate review undertaken to attack or defend a trial court's decision in the suit." *Shands*, 115 Wis. 2d at 359, 340 N.W.2d at 509. Even though the statute in *Shands*, § 100.20(5), STATS., employs "shall" while § 51.61(7)(a), STATS., uses "may" with respect to a plaintiff's recovery of damages, costs and attorney fees, the supreme court's rationale is persuasive here. The policy considerations behind the fee-shifting provisions of both statutes are similar, and "to deny attorney fees to [plaintiffs] who need to pursue appellate review to enforce their rights would undercut the salutary objectives of the statute." *Shands*, 115 Wis. 2d at 359, 340 N.W.2d at 509.

income. The resulting loss in "consumptive benefit" for Cheryl Wright ranged from $415,000 to over $700,000, not adjusted to present value.

Mercy moved after the verdict "to modify the verdict under . . . § 805.14(1) and § 805.14(5)(c), Wis. Stats. by changing the answer to Question 7(c) from $350,000.00 to zero." The court reduced the economic loss figure from $350,000 to $10,000. The trial court stated its order was "based on the *Prill*[8] case and based upon the policy statement contained therein and based upon the fact that I think there is properly proved some damages for the period of time of March 10th until Ms. Wright's divorce."

■

Even though Mercy's post-verdict motion was labelled a motion challenging the sufficiency of the evidence to support the jury's answer to Question 7(c), we construe it as a renewal of its motion at the close of all evidence for dismissal of Wright's economic loss claim "as a matter of law."[9] In reducing the jury's award from $350,000 to $10,000, the court disallowed the post-divorce damages "as a matter of law," and was in effect substantially granting Mercy's earlier motion to dismiss. We therefore review its action without deference

---

[8] *Prill v. Hampton*, 154 Wis. 2d 667, 453 N.W.2d 909 (Ct. App. 1990).

[9] Mercy raised the issue even prior to trial in the form of a motion in limine to "[p]rohibit plaintiff from introducing evidence as to any pecuniary loss . . . which plaintiff claims to have suffered as a result of her divorce from Charles Wright." At the conclusion of the instructions conference, Mercy renewed its "request to dismiss those claims on the basis of the *Prill* case and authorities submitted" in the pretrial motion. The court took the motion to dismiss under advisement.

to the trial court's decision. *See Ball v. District No. 4*, 117 Wis. 2d 529, 537, 345 N.W.2d 389, 394 (1984).

In *Prill v. Hampton*, 154 Wis. 2d 667, 453 N.W.2d 909 (Ct. App. 1990), we refused to recognize an action by a former spouse "to prove that [injuries to her former spouse] caused the divorce and that she is entitled to damages for 'wrongful divorce.' " *Id.* at 681, 453 N.W.2d at 914. We cited the following as public policy considerations weighing against such actions:

> Failure of a marriage is rarely attributable to a single cause. In some instances, there may be evidence that the spouse's injuries were, in part, the cause of the marriage's failure. For the jury to properly assess the amount of damages, however, it is necessary to show both a causal relationship and the extent or degree this factor played in the failure of the marriage. Such an inquiry would open to scrutiny very personal issues, not only of the spouse claiming damages, but also of the injured spouse. This factor, along with the difficulty of the jury in determining the extent to which any single cause may have contributed to the failure of the marriage, requires that such claims be rejected.

*Id.* at 681, 453 N.W.2d at 914–15.

Wright argues that the facts in *Prill* were materially different and the public policy considerations stated therein do not apply to this case. She notes that in *Prill* the plaintiff whose cause was denied was the spouse of the victim of tortious conduct, unlike Wright, who was herself the tort victim. According to Wright, § 768.01, STATS., which we cited in *Prill* as illustrative of the public policy against allowing a claim for wrongful divorce, abolishes a cause of action for alienation of affections but not the right to receive damages on an otherwise valid cause of action. She claims that

474

§ 51.61(7)(a), STATS., which allows a mental health patient to recover for "any damages" sustained as a result of inadequate treatment, denotes a public policy in favor of Wright's entitlement to a recovery on these facts. She also likens her case to a claim for seduction[10] and one for sexual exploitation by a therapist under § 895.70, STATS. Finally, Wright argues that the *Prill* holding ignores Wisconsin law on multiple causation, and that the economic loss damages in this case are not speculative or unmanageable.

We do not find Wright's arguments persuasive. Her right to pursue a claim for negligent treatment at the hands of Connelly and Mercy is undisputed, as is her right to be compensated for past and future medical expense, and for physical and emotional pain and suffering. Wright's proof of economic loss, however, and her arguments to the jury thereon, were solely based upon the difference in her standard of living as a single person as opposed to what she would have enjoyed had her marriage continued.[11] Her claim for economic loss was not grounded upon any impairment of her own

---

[10] *See Slawek v. Stroh*, 62 Wis. 2d 295, 312, 215 N.W.2d 9, 19 (1974).

[11] The jury was instructed as follows:

Question 7(c) asks what amount of money will compensate Cheryl Wright for economic losses flowing from the interference with her family relationships.

In answering this question, you will consider ages of the former spouse, the condition of their health prior to the break up of the marriage, earning capacity, and their reasonable prospects for earning at the time of the marriage break up. You should also allow such sum as will equal the value of support and protection Charles Wright would have . . . furnished to Cheryl if the marriage would have continued.

The instruction is patterned after WIS J I—CIVIL 1861, Death of a Spouse: Pecuniary Loss.

earning capacity, but upon the fact of her divorce. Her claim for economic loss damages was thus simply a claim based upon "wrongful divorce," which we refused to recognize in *Prill* and similarly decline to recognize here.

Our holding in *Prill* was not dependent upon which spouse was the plaintiff. There, the wife's claim for "wrongful divorce" had been joined with her ex-husband's successful personal injury claim. Our result would not have been different had Mr. Prill attempted to claim compensation from the tortfeasor for damages he sustained because of the divorce. We thus reject Wright's argument that a claim for "wrongful divorce" damages can be maintained by a tort victim, as long as it is piggy-backed onto the victim's otherwise meritorious cause of action.

In *Koestler v. Pollard*, 162 Wis. 2d 797, 471 N.W.2d 7 (1991), the supreme court held that an action nominally pled as one for intentional infliction of mental distress was in reality only an embellished complaint for criminal conversation, an action which is also abolished by statute.[12] *Id.* at 805-06, 471 N.W.2d at 10-11. In upholding the dismissal of the claim, the court noted that the "claim violates public policy because claims such as [t]his embroil the courts in disputes in which judicial intervention is inappropriate." *Id.* at 804, 471 N.W.2d at 10.

We fail to see how § 51.61 or § 895.70, STATS., alter the public policy considerations espoused in *Prill* and *Koestler*. The legislature has decreed in these statutes that inadequately treated mental health patients should be compensated for damages they suffer as a result thereof, § 51.61(7)(a), and that victims of sexual

---

[12] *See* § 768.01, STATS.

exploitation by a therapist should be able to bring suit for "physical, mental or emotional injury caused by, resulting from or arising out of sexual contact with a therapist," § 895.70(2). Neither statute expresses or implies any endorsement of claims for loss of a relationship or for "wrongful divorce."

It is true, as Wright states, that Wisconsin espouses the concept of multiple causation in tort litigation. *See Pfeifer v. Standard Gateway Theater, Inc.*, 262 Wis. 229, 236-37, 55 N.W.2d 29, 33 (1952); WIS J I—CIVIL 1500, Cause. But the fact that our courts will permit a jury to find that more than one negligent actor was a substantial factor in causing injury to a plaintiff does not mean that we must allow similar inquiries into the causes of marital breakdown:

> [T]he difficulty of determining liability made the alienation of affections tort inequitable. In alienation of affections actions the plaintiff had to prove that the defendant was the controlling cause of the loss of affections. The tort concept of causation is too simplistic when the interest protected is the marital relationship. Marriages vulnerable to a third party's interference are often troubled ones for a number of reasons. Assigning blame and causation for interference with the complex relationship of marriage is extraordinarily difficult, if not impossible. To mask the difficulties of proving causation a plaintiff may manipulate the sympathies, prejudices and passions of a jury by stressing the defendant's misconduct.

*Koestler*, 162 Wis. 2d at 817-18, 471 N.W.2d at 15 (Abrahamson, J., dissenting).[13]

---

[13] The dissent in *Koestler* viewed Koestler's complaint as stating a valid claim for intentional infliction of emotional distress which was not barred by statute or public policy. *Koestler*

██

In short, the legislature and courts of our state have concluded that neither societal interests nor those of individual litigants are well served by permitting actions for wrongful divorce. The trial court properly dismissed Wright's claim for economic damages she incurred as a result of her divorce.

██

Mercy argues in its responsive brief on the cross-appeal that no damages whatsoever should be allowed for economic loss given that Wright's claim for economic loss was solely premised on her divorce. But Mercy did not appeal the trial court's allowance of $10,000 in damages for pre-divorce economic loss it deemed supported by evidence at the trial. We therefore decline to further modify the verdict. We affirm the trial court's dismissal of Wright's claim for economic loss occasioned by her divorce and the modification of the verdict to effect the dismissal of that claim.

██

We therefore affirm the trial court with respect to each ground raised in Mercy's appeal and the trial court's reduction of economic damages to Wright raised in Wright's cross-appeal. As discussed above, we remand for a determination by the trial court of the amount of reasonable appellate attorney fees to be awarded to Wright.

---

*v. Pollard*, 162 Wis. 2d 797, 810, 471 N.W.2d 7, 12 (1991) (Abrahamson, J., dissenting). Even though the dissent would have allowed Koestler's claim to proceed, its discussion of the distinctions between the statutorily barred actions and other torts reveals why Wright's claim for economic loss based upon "wrongful divorce" must be treated differently than her other claims in this case.

*By the Court.*—Judgment and order affirmed and cause remanded with directions.