Emil E. JANKEE and Mary Jankee, Plaintiffs-Appellants-Petitioners,

v.

CLARK COUNTY, Wisconsin Health Care Liability Insurance Plan, Defendants-Respondents-Cross-Appellants-Petitioners,

CONTINENTAL CASUALTY CO., Hammel, Green & Abrahamson, Inc., Defendants-Respondents-Cross-Appellants-Cross-Respondents,

WAUSAU UNDERWRITERS INS. CO., J.P. Cullen & Sons, Inc., St. Paul Fire & Marine Ins. Co., and Wausau Metal Corp. d/b/a Milco, Defendants-Respondents-Cross-Respondents,

WISCONSIN DEPARTMENT OF HEALTH AND SOCIAL SERVICES, Defendant.

Supreme Court

*No. 95–2136. Oral argument October 5, 1999.—Decided June 22, 2000.*

2000 WI 64

(Also reported in 612 N.W.2d 297.)

706

For the plaintiffs-appellants-petitioners there were briefs by *Ronald G. Tays, Hope K. Olson* and *Previant, Goldberg, Uelmen, Gratz, Miller & Brueggeman, S.C.*, Milwaukee and oral argument by *Ronald G. Tays.*

For the defendants-respondents-cross appellants-petitioners there were briefs by *Timothy F. Mentkowski, Mary E. Nelson* and *Crivello, Carlson, Mentkowski & Steeves, S.C.*, Milwaukee and oral argument by *Timothy F. Mentkowski.*

For the defendants-respondents-cross appellants-cross respondents there was a brief by *Timothy R. Murphy* and *Askegaard, Robinson, Murphy & Schweich, P.A.*, Brainerd, Minnesota and oral argument by *Timothy R. Murphy.*

For the defendants-respondents-cross respondents, Wausau Underwriters Insurance Co. and J.P. Cullen & Sons, Inc., there was a brief by *Wayne R. Luck* and *Law Offices of Stilp and Cotton*, Appelton and oral argument by *Wayne R. Luck.*

For the defendants-respondents-cross respondents, St. Paul Fire & Marine Insurance Co. and Wausau Metals Corporation, d/b/a Milco, there was a brief by *John P. Richie* and *Misfeldt, Stark, Richie, Wickstrom & Wachs*, Eau Claire and oral argument by *John P. Richie.*

Amicus curiae was filed by *W. Wayne Siesennop, Mary Susan Maloney* and *Hannan, Siesennop & Sulli-*

*van,* Milwaukee for the Wisconsin Association of Consulting Engineers and the Wisconsin Society of Architects, Inc., doing business as AIA Wisconsin.

Amicus curiae was filed by *Charles V. Sweeney, Raymond P. Taffora, Nia Enemuoh-Trammell* and *Michael Best & Friedrich, LLP*, Madison for the Wisconsin Transportation Builders Association.

Amicus curiae was filed by *Alan E. Gesler* and *Slattery & Hausman, Ltd.*, Waukesha for the Wisconsin Academy of Trial Lawyers.

¶ 1. DAVID T. PROSSER, J. Emil and Mary Jankee and Clark County seek review of a published decision of the court of appeals, *Jankee v. Clark County*, 222 Wis. 2d 151, 585 N.W.2d 913 (Ct. App. 1998), affirming in part and reversing in part an order of the Circuit Court for Clark County, Duane Polivka, Judge.

¶ 2. Emil Jankee (Jankee) sustained paralyzing injuries during an attempt to escape from Clark County Health Care Center (CCHCC), after he squeezed through an opening in a third-floor window and then fell from the roof, fracturing his back. Emil and Mary Jankee (Jankees) filed a complaint against Clark County and against three other parties, namely the architect, contractor, and subcontractor responsible for designing and implementing CCHCC's building renovations several years earlier.

¶ 3. The Jankees sued Clark County for negligently failing to supervise Jankee adequately while he was in the County's custody and control. They also pursued negligence claims against the architectural firm of Hammel, Green & Abrahamson, Inc. (HGA), building contractor J.P. Cullen & Sons, Inc. (Cullen),

and Cullen's subcontractor, Wausau Metals Corporation, doing business as MILCO, alleging that the selection and installation of defective and dangerous windows caused Jankee's injuries. In addition, the Jankees initiated a strict liability action against MILCO, the manufacturer of the CCHCC windows, for failure to design and manufacture a reasonably safe product.

¶ 4. The circuit court granted summary judgment to HGA, Cullen, and MILCO, finding that the government contractor immunity doctrine rendered those defendants immune from liability. The court also granted the summary judgment motion of Clark County, holding that the doctrine of contributory negligence precluded recovery as a matter of law because Jankee's negligence was greater than the negligence of each of the four defendants.

¶ 5. The court of appeals affirmed the summary judgment motions granted to the three contractor defendants, holding that the defense of government contractor immunity entitled them to immunity as a matter of law. *Jankee*, 222 Wis. 2d at 154–55. The court reversed the circuit court, however, on the claim against Clark County, concluding that if Jankee were incapable of controlling or appreciating his conduct, he could not be held contributorily negligent. *Id.* at 155. Because the court of appeals ruled that Jankee's conduct should be gauged under a subjective standard of care, the court discerned disputed issues of fact relating to Jankee's capacity. The court of appeals therefore found that the circuit court had erred in dismissing the claim against Clark County, and it remanded the issue of contributory negligence. *Id.* at 178.

¶ 6. Jankee petitioned this court seeking review of the decision of the court of appeals to affirm the

summary judgment motions granted to the three contractors on the governmental contractor immunity issue. Clark County cross-petitioned this court, asking us to review the court of appeals decision to extend governmental immunity to the defendant contractors and the decision to apply a reasonable person standard to evaluate Jankee's conduct.

¶ 7. In our review, we do not address the strict liability cause of action. The court of appeals did not reach the strict liability claim against MILCO because it found MILCO, like the other two contractor defendants, immune from liability. *Jankee*, 222 Wis. 2d at 155 n.2. Jankee did not raise the strict liability issue in his petition for review, and we decline to address it here. *See State v. Bodoh*, 226 Wis. 2d 718, 722, 595 N.W.2d 330 (1999). Generally, a petitioner cannot raise or argue issues not set forth in the petition for review unless this court orders otherwise. Wis. Stat. § 809.62(6).[1] If an issue is not raised in the petition for review or in a cross petition, "the issue is not before us." *State v. Weber*, 164 Wis. 2d 788, 791 n.2, 476 N.W.2d 867 (1991) (Abrahamson, J., dissenting) (citing *Betchkal v. Willis*, 127 Wis. 2d 177, 183 n.4, 378 N.W.2d 684 (1985)).

¶ 8. Two issues are before the court. The first is whether a mentally disabled plaintiff who is involuntarily committed to a mental health facility can be held contributorily negligent for injuries sustained during an escape attempt from that facility. The second issue is whether architects, contractors, and subcontractors engaged to work for the government in the renovation of a public mental health facility can invoke the defense of government contractor immunity.

---

[1] All references to the Wisconsin Statutes are to the 1987–88 statutes unless indicated otherwise.

¶ 9. We hold that Wisconsin's contributory negligence statute, Wis. Stat. § 895.045,[2] bars the Jankees' claim against each of the defendants because Jankee's own negligence exceeded the negligence of the defendants as a matter of law. When a plaintiff's negligence is greater than the negligence of any defendant, it is our duty to find that the plaintiff's contributory negligence bars recovery. *Johnson v. Grzadzielewski*, 159 Wis. 2d 601, 608–09, 465 N.W.2d 503 (Ct. App. 1990) (citing *Gross v. Denow*, 61 Wis. 2d 40, 49, 212 N.W.2d 2 (1973)). Jankee was more responsible than the defendants for his injuries for two reasons. First, Jankee's hospitalization resulted from his failure to comply with a medication program that controlled his mental disability. Under a reasonable person standard of care, a reasonable person would understand that he was required to maintain his prescribed medication in order to avoid the potential ramifications of his mental disability. Second, under the reasonable person standard of care, Jankee was bound to exercise the duty of ordinary care when he tried to escape from CCHCC. We do not decide whether government contractor immunity shields HGA, Cullen, and MILCO from liability, because we uphold the circuit court's summary judgment on the ground that the quantum of Jankee's contributory negligence disqualified him under

[2] At the time of Jankee's accident, Wisconsin's contributory negligence statute, Wis. Stat. § 895.045, read:

Contributory negligence shall not bar recovery in an action by any person or his legal representative to recover damages for negligence resulting in death or in injury to person or property, if such negligence was not greater than the negligence of the person against whom recovery is sought, but any damages allowed shall be diminished in the proportion to the amount of negligence attributable to the person recovering.

712

§ 895.045.[3] Accordingly, we reverse the decision of the court of appeals.

## FACTS

¶ 10. The facts in this case are complex, and the record is extensive. The circuit court did not address every undisputed fact detailed in the many pleadings, depositions, answers, and affidavits. Nonetheless, the court made findings of fact for the government contractor immunity issue and based its decision to find Jankee contributorily negligent to a disqualifying degree as a matter of law expressly on Jankee's actions as documented in the entire record. Although an appellate court cannot make its own findings of fact, *Wurtz v. Fleischman*, 97 Wis. 2d 100, 108, 293 N.W.2d 155 (1980), this court searches the record to support the circuit court's findings of fact. *In Matter of Estate of Becker*, 76 Wis. 2d 336, 347, 251 N.W.2d 431 (1977). Where, as here, a circuit court has relied on a voluminous record as its basis for findings of fact, we turn to that record to set forth the pertinent facts.

¶ 11. Emil Jankee suffers from bipolar affective disorder, more commonly known as manic depressive illness. He attempted suicide at the age of 12 or 13 by taking an overdose of aspirin. Between March 5 and April 17, 1984, at the age of 26, Jankee was hospitalized voluntarily for manic depressive illness at

[3] "As a general rule, when our resolution of one issue disposes of a case, we will not address additional issues." *Hull v. State Farm Mut. Auto. Ins. Co.*, 222 Wis. 2d 627, 640 n.7, 586 N.W.2d 863 (1998). The parties agreed at oral argument that if we were to find Jankee contributorily negligent and this negligence exceeded the causal negligence, if any, of the defendants, we would not have to reach the government contractor immunity issue.

Norwood Health Care Center (Norwood) in Marshfield, Wisconsin. His behavior included sleep disturbances, intrusiveness, religiosity, assaultiveness, and an inability to cooperate. Consequently, Jankee spent part of the time at Norwood in a locked security area. Norwood treated Jankee with lithium and haldol. On April 1, 1984, Jankee insisted on leaving Norwood and threatened either to break a window to get out or to hang himself.

¶ 12. By April 17, 1984, Jankee's condition had improved. Jankee, however, experienced problems with "medication compliance." Norwood physicians warned that his continued improvement hinged upon ongoing compliance with the treatment program. Doctors recorded that Jankee understood that he would progress only if he stayed on the medication, but they warned that Jankee could relapse easily if he suspended his treatment.

¶ 13. Within six weeks of his April 1984 discharge, Jankee ceased taking the medications, convinced that he no longer needed them. Even Jankee's medical expert in this case, psychiatrist Melvin J. Soo Hoo, M.D., conceded that Jankee's personal decision to stop taking the medications contradicted doctors' advice. When Jankee unilaterally suspended the medications, physicians urged him to resume the treatment, but he did not. Jankee experienced a relapse, much as predicted, and he was rehospitalized voluntarily at Norwood on July 19, 1984.

¶ 14. At the time of his July 1984 hospitalization, Jankee admitted that he had contemplated suicide but added that he had made no recent attempts to kill himself. He denied feeling suicidal at the time of admission. Norwood evaluated Jankee's condition as somewhat, but not especially, depressed, and doctors

found him rational, organized, and in control. Jankee had accumulated some debts, including the purchase of a Cadillac. He had no means by which to keep up payments for these debts. The treating physician, Dr. W. Warren Garitano, noted that although Jankee was in good control, Jankee despaired and searched for an easy solution to his self-created problems. Dr. Garitano formally noted in Jankee's record on two occasions that "one certainly must entertain the idea that he may be deliberately provoking illness to avoid [his] responsibilities."

¶ 15. Norwood records for this second hospitalization, like those from the previous confinement, remark that Jankee's condition was good with medication compliance. Staff once more instructed Jankee to continue with the medication and to seek psychiatric follow-up. Although he commented that he should be well enough to suspend the lithium within a month or two, Jankee conceded that his treatment was "just like insulin, [ ] take it for life." A nurse noted in Jankee's chart that despite his realization about the positive effects of the medication, Jankee ignored those benefits and instead counted "on himself to cure all." At his discharge, a social worker recommended that Jankee be situated in a halfway house if medication noncompliance were to spark a deterioration.

¶ 16. Dr. Soo Hoo testified that patients like Jankee, if not treated with medication, are prone to future episodes of decompensation.[4] Had Jankee stayed on his medication in 1984, Dr. Soo Hoo observed, in all likelihood he would have been in an improved condition, and his risk of another flare-up

[4] Decompensation is "[t]he appearance or exacerbation of a mental disorder due to failure of defense mechanisms." *Stedman's Medical Dictionary* (1976).

would have been reduced. Nonetheless, following his second release, Jankee suspended his haldol treatment, apparently because of side effects, and he also discontinued taking lithium. At his 1993 deposition, Jankee testified that he prefers not to take medication.

¶ 17. Jankee experienced another relapse in July 1989, 11 days after he married Mary Gwozd. On the evening of July 13, 1989, he and his wife engaged in a violent domestic altercation. After the dispute, Jankee left his home and began walking down the highway, where police picked him up after his wife reported the incident. Jankee spent the night in jail, and the next morning, the court detained him for a 30-day evaluation to determine whether he was competent to stand trial for domestic abuse. Jankee was given the choice of confinement at Norwood or CCHCC. Jankee chose the latter facility because of CCHCC's proximity to his home and to the home of his parents,[5] making it easier for his wife and family to visit him. CCHCC admitted Jankee to its New Horizons Unit, a locked, long-term care ward for the chronically mentally disabled.

¶ 18. CCHCC has been serving Clark County and its surrounding areas continuously since 1922. In the late 1970s and early 1980s, it operated as a nursing home for the mentally disabled and elderly. In 1980, CCHCC embarked on a renovation to bring the facility in compliance with applicable nursing home and hospital regulations. CCHCC had been plagued by numerous building code violations and was in jeopardy of losing its license if the building were not updated. Clark County hired HGA as the project architect, and it selected Cullen as the general contractor for the refurbishment.

---

[5] CCHCC is ten miles from Jankee's house and two miles from his parents' residence.

¶ 19. Window design was one of the factors Clark County considered in planning the renovation. CCHCC intended to provide its patients with as normal an environment as possible and sought to create a healing, therapeutic atmosphere free from prison-like overtones. Thus, CCHCC administrators ruled out the installation of window bars. Thirty years earlier, the facility had employed security-screened windows. On the eve of the renovation, however, CCHCC determined that such windows were an outdated concept that counteracted the rehabilitative nature of the institution.

¶ 20. State regulations also came into play in the selection of window design at CCHCC. No part of the building featured air conditioning prior to the renovation. Clark County expressed concern about state regulations requiring adequate ventilation. Air conditioning was thought cost prohibitive, and the Wisconsin Administrative Code forbade the use of fans.[6] If a facility has no air conditioning, regulations require windows to open a specific percentage, based on the square footage of an area, to allow air circulation. In addition, the State of Wisconsin already had cited CCHCC because "[s]everal resident sleeping rooms have locked windows or security screens. Unless a waiver (federal) and variance (state) is requested and granted, windows shall be operable and openable without tools or keys."

¶ 21. CCHCC administrators and other personnel met with HGA to discuss solutions to these design concerns. HGA drafted specifications that called for

---

[6] Robert J. Young, a licensed architect who testified as Jankee's expert witness, referred to the Administrative Code in his deposition but did not cite the sections that address these regulations.

MILCO aluminum frame windows that slid horizontally to open. The proposed windows were to include standard-type sash hardware and a removable stop to prevent their opening to a width of more than five inches. HGA recommended a five-inch opening because state building codes permitted no more than a six-inch opening on balcony guardrails. HGA's principal architect for the project, Daniel Swedberg, reasoned that if guardrail openings of six inches were, under state law, sufficient to prevent someone from squeezing through, then a window opening that was one inch narrower would meet CCHCC's needs.

¶ 22. Cullen subcontracted MILCO to design, manufacture, and install the windows. MILCO designed a cube stop that served simultaneously as a locking device and a removable stop. The cube stop consisted of an approximately one-and-one-half inch metal cube that inserted into the top of the window's frame head and screwed into place with an Allen wrench to prevent the window from sliding entirely open. The cube stop functioned so that: (1) the window could be locked in place at only five inches, or alternatively any other distance as the window slid to the fully open position; or (2) the window could be opened unhindered to any distance if the cube stop were removed with an Allen wrench; or (3) the window would be sealed in a closed position by locking the cube stop in place. HGA approved MILCO's shop drawings for this proposal. A CCHCC administrator explained that Clark County had relied upon HGA's expertise in the choice of this design, and the County therefore did not review the window specifications.

¶ 23. During the period when the window installation was under way, in the spring of 1984, a patient housed on CCHCC's first floor managed to remove a

cube stop and open a window completely. Clark County contacted HGA and requested modifications to reinforce the barrier to a complete opening. MILCO offered to remedy the problem by adding channel stops to the existing design. The channel stops were non-removable, 15–1/2-inch long pieces of metal installed into the upper track of the frame, extending from the jamb of the window to the point at which the possible maximum window opening would be fixed. The channel stops were designed to allow for the window to travel no more than four inches, thereby restricting the opening to three inches.

¶ 24. Cullen relayed MILCO's proposed design modification in a letter to HGA, but the letter did not specify that the maximum window opening width would be changed from the contracted five inches to the revised three inches. Thus, Clark County approved installation of the channel stops apparently unaware that the addition of channel stops permitted only the narrower, three-inch opening.

¶ 25. After the windows had been installed, HGA carried out an inspection of the CCHCC project in November 1984. HGA noticed the windows opened only three inches, not the five inches originally specified in the agreement with Clark County. HGA contacted MILCO about the discrepancy, and MILCO responded that it had never been notified that the channel stops must allow the wider, five-inch opening. MILCO offered to modify the channel stops at an additional cost.

¶ 26. The window openings allowed by the channel stops were widened, but the record does not reveal with certainty which parties, or whether any of the parties to this lawsuit, ultimately implemented the modifications. The modifications consisted of shorten-

ing the length of the channel stops to 13 inches. After the channel stops were shortened, the cube stops were reinstalled between the window and the channel stops; the two stops thus were positioned in the top track of the window. MILCO's design engineer later observed that this placement rendered the cube stop ineffective. If the window sash were rocked back and forth against the channel stop, the cube stop could be forced to slide out of place.

¶ 27. In 1987 a patient made an escape attempt from CCHCC by removing a screw that held the channel stop in place. This removal allowed the patient to open the window to a width that permitted exit. Clark County conducted an investigation of this incident and concluded that the channel stops still offered the facility sufficient security protections. CCHCC administrator Aryln Mills later testified that the particular patient had been able to escape because he "had basically been a very unique type of individual that had skills beyond that which would be expected to be possessed by another patient." Consequently, Clark County left the stop system in place unchanged. Until Jankee arrived at CCHCC in July 1989, there had been no subsequent successful elopements from the facility.

¶ 28. A CCHCC physician believed that under the law, medication could not be administered in a voluntary confinement without a patient's consent. The physician therefore contacted the district attorney, and after some discussion, Chapter 51 proceedings were initiated. A Chapter 51 commitment would ensure that Jankee received treatment with medication.

¶ 29. Early in his admission, Jankee displayed threatening and destructive behavior. Consequently, CCHCC placed Jankee under an emergency 72-hour

detention. Instructions for that detention directed staff to contact a nurse and a physician if Jankee's behavior became aggressive or if he were a danger to himself or others. Although hospital records fail to reveal that Jankee ever threatened to harm himself, the long-term goal for the detention period was that Jankee "not harm [him]self or others." Between July 15, 1989, and July 21, 1989, Jankee remained in an isolation room, and staff checked on him at first every five minutes and then every fifteen minutes. CCHCC staff recorded Jankee's condition on its Flow Sheet for patients monitored for suicide checks, seclusion, restraint, and wandering.[7] By July 21, Jankee was quiet, cooperative with staff, and no longer destroying property. CCHCC then switched him from isolation to "the south room," a corner room on the third floor of the locked New Horizons Unit.

¶ 30. During the course of his entire hospitalization at CCHCC, Jankee voiced no thoughts of self-destruction. At no time did a psychiatrist or other professional staff determine that he was either suicidal or an elopement risk. Hospital policies require staff to address patients who present an elopement risk; Jankee's records contain no such notations. A July 18, 1989, psychiatric evaluation indicated Jankee was not suicidal. A July 20 Physician's Report to Clark County Circuit Court reported that "[t]here is substantial risk of harm to others," but it remained silent on whether

---

[7] It appears from the record that this Flow Sheet is a standard form CCHCC uses to monitor patients. Although entitled "Suicide Precautions" on its face side, on its reverse the form explains the behavior codes staff are to note not only for suicide, but also for patients in seclusion, in restraint, or wandering. The record indicates that Jankee was on 15-minute checks for aggressive behavior toward others.

Jankee was inclined to harm himself. Later, on July 25, another Physician's Report to the court remarked that "[p]atient is more likely to be a danger to his wife, though 10 years ago he did take an overdose of aspirin in order to die."

¶ 31. Dr. Soo Hoo noted that Jankee's discharge summary suggested he was under a considerable influence of delusions and exercised poor judgment, but remarked that Jankee was not someone "imminently engrossed in suicidal preoccupations." Jankee expressed to CCHCC that he was "looking very much forward to getting his life and relationship with his new wife back in order," and he stressed that his religious faith prevented him from harming his wife or himself. Similarly, Dr. Soo Hoo testified that Jankee "is very sensitive to wanting to survive. This is not someone who is intent on harming himself."

¶ 32. Jankee's new room had three windows: one faced south, and two looked east. The windows to the east were situated three stories above the ground. The south window, on the other hand, overlooked the roof of the building's second story, a flat surface about 20 feet wide and situated two or three feet below Jankee's windowsill. Jankee noted that the south window located in his room was "just far enough so somebody couldn't see [it] from the door area."

¶ 33. The south window was equipped with one of the modified channel stops that allowed for an opening greater than three inches. Several days before making his escape attempt, Jankee took note that the windows in his room opened about four inches. The windows were not locked shut. Both Jankee and the staff would open the windows for ventilation.

¶ 34. On the evening of July 25, 1989, Jankee's wife visited him at about 6:00 or 7:00, bringing pizza

and cheesecake. Jankee told her he "wanted to get out." At about 8:40 p.m., while his wife was still at CCHCC, Jankee walked to the nurses' station and announced "I'm tired of being used for a guinea pig around here. Why don't you kick my ass out of here instead of giving me a bunch of medicine." Jankee's wife departed at 10:30 p.m. At his deposition, Jankee testified that he decided to leave CCHCC about 30 minutes later, after watching Johnny Carson.

¶ 35. Jankee testified about the motivations behind his escape plan at his deposition. During his hospitalization, Jankee believed that "God or Satan or someone" directed his activities, including the escape. Jankee also indicated that he wanted to leave because he was tired of being at CCHCC, missed his wife and family, and was anxious to finish his plans to move and renovate a house. He planned to depart from CCHCC that evening, see his wife, and return to the facility before breakfast, "with nobody being the wiser." He did not plan to kill himself.

¶ 36. It is not clear exactly when Jankee attempted to escape. At about 11:30 p.m., Jankee walked to the nursing station and asked for a drink of water. Nurses did not notice any agitation or anxiety. He apparently visited the station again between 12:15 a.m. and 12:30 a.m., and nurses gave him another glass of water at 1:00 a.m.

¶ 37. In executing his plan, Jankee hoped to "fool" staff into thinking that he was still in his room. He anticipated a bed check, so he "covered his tracks." Jankee fluffed up some pillows on his bed and put them under blankets to make it appear as if he were in the room. He drew closed the curtain at south window. That way, Jankee reasoned, the window would be covered from the view of those who peered into his room,

and "they couldn't see that it was open." He then began working on the window from behind the curtain. Jankee turned off his room light and relied on a yard light situated just outside his window. He bent a toothbrush to a 45-degree angle so he could use it for turning, and he pried off the cube stop. Without the cube stop, the window could be jammed open an additional two inches, wide enough at the bottom for Jankee's head to get through and allow him to squeeze through the window. Before he exited, Jankee removed his cotton shirt to give himself more clearance. The process took between 15 and 20 minutes.

¶ 38. Jankee selected the south window for his elopement because the flat, brick roof, situated a few feet beneath his window, offered a safer way to exit than either of the two east windows. He acknowledged that he would "probably get killed" were he to fall three stories from an east window. Even though Jankee "felt protected" and was not worried about falling, he did not jump the full three stories because he "knew that would be definitely suicide." At his deposition, Jankee agreed that he "knew [it] was dangerous" to jump out the east window from the third story. He also "could appreciate that would not be using good judgment," and he testified that he sought to "lower the risk of injury to" himself. Dr. Soo Hoo agreed that Jankee appeared to be exercising caution for his own safety.

¶ 39. From the south window, Jankee was able to step out of his room onto the roof. He planned to move hand-over-hand from one window ledge to the next and then to scale the two stories down one side of the building, until he was a safe jumping distance from the ground. While on the roof, Jankee noticed a carved stone figure protruding from the brick facade between two east windows on the second floor. He shimmied on

his stomach and, holding on to a masonry cap atop the wall surrounding the roof, slid over the edge of the roof until his feet touched the stone figure. From there, Jankee began moving along the brick ledge, just above the figure. While scaling the brick ledge, Jankee lost his fingerhold because of dew or other moisture, and fell to the ground.

¶ 40. CCHCC policy required staff to check patient rooms every two hours. At 3:00 a.m., a nurse conducted a bed check of Jankee's room. The nurse did not see Jankee's face, but he noticed respirations. One hour later, another nurse opened the door of Jankee's room and thought she saw him in bed. At 5:55 a.m. on the morning of July 26, 1989, CCHCC security found Jankee lying on the ground about five or six feet from the southeast side of the building. Jankee complained of not being able to move his legs, and he had abrasions on his forehead and eyebrow. He told a nurse, "I'm sorry [ ], I had to get out of there." An ambulance transferred Jankee to St. Joseph's hospital in Marshfield. Sometime between 6:30 and 6:40 a.m., Jankee's wife called and asked: "Is Emil there?"

¶ 41. The fall fractured Jankee's back. If Jankee uses leg braces, he can be on his feet between 30 minutes and one hour; otherwise, he uses a wheelchair.

## PROCEDURAL HISTORY

¶ 42. The Jankees filed a negligence claim against Clark County, contending that CCHCC failed to supervise and restrain Jankee properly and provide him with a safe place while Jankee was in Clark County's custody and control. The Jankees also sought recovery from HGA, Cullen, and MILCO, claiming those defendants negligently failed to design and construct a safe psychiatric unit window and neglected to

warn Jankee about its defective and dangerous condition. In addition, the Jankees pursued relief from MILCO under a strict liability theory, arguing that the subcontractor failed to design and manufacture a reasonably safe product suitable for use in mental institutions.

¶ 43. Each of the four defendants moved for summary judgment. Initially, the circuit court granted only the motion of MILCO, finding that with respect to the strict liability claim, MILCO could not be liable because Jankee confronted an open and obvious danger. Following that dismissal, the Jankees, Clark County, and HGA pursued appeals. While the appeal was pending, MILCO asked the court of appeals for permission to address a new issue, the defense of government contractor immunity, based on the then-recent decision in *Lyons v. CNA Ins. Co.*, 207 Wis. 2d 446, 558 N.W.2d 658 (Ct. App. 1996). Subsequently, HGA and Cullen also advanced the government contractor immunity defense. The court of appeals remanded the case to the circuit court for additional proceedings with respect to the *Lyons* government contractor immunity issue. *Jankee v. Clark County*, No. 95–2136, unpublished slip op. at 5 (Wis. Ct. App. May 9, 1997). The court also noted two other recent cases, *Gould v. American Family Mut. Ins. Co.*, 198 Wis. 2d 450, 543 N.W.2d 282 (1996), and *Burch v. American Family Mut. Ins. Co.*, 198 Wis. 2d 465, 543 N.W.2d 277 (1996), might impact the issue of Jankee's capacity. *Id.* at 6 n.1.

¶ 44. On remand, the circuit court heard arguments from Clark County, HGA, Cullen, and MILCO about the application of the government contractor immunity defense. Under *Lyons*, 207 Wis. 2d 446, gov-

726

ernmental contractors are entitled to immunity in these circumstances:

> An independent professional contractor who follows official directives is an "agent" for the purposes of § 893.80(4), STATS., or is entitled to common law immunity when:
>
> (1) the governmental authority approved reasonably precise specifications;
>
> (2) the contractor's actions conformed to those specifications; and
>
> (3) the contractor warned the supervising governmental authority about the possible dangers associated with those specifications that were known to the contractor but not to the governmental officials.

*Id.* at 457–58. Clark County disputed application of the second prong of the *Lyons* test to HGA, Cullen, and MILCO.[8] The County maintained that the case presented an issue of material fact because the three-

---

[8] At the first circuit court summary judgment motion hearing, Clark County had advanced a defense of governmental immunity. The circuit court declined to grant summary judgment motion on that theory because it found material facts in dispute about whether Clark County had fulfilled its ministerial duties while Jankee was in CCHCC's custody during the night of the accident. The court also reasoned that the modification of the window openings was not made on a policy or planning level, but on an operational level, and therefore the decision to modify the windows was not a decision protected by governmental immunity. The court therefore determined that the decision to modify the window openings was not a decision protected by discretionary policy law. Clark County did not readvance the governmental immunity argument after the court of appeals remanded the case to the circuit court.

inch opening that resulted from the window design modification did not meet its contract specifications, which required a five-inch opening. The circuit court, however, made a finding of fact and determined that the windows met the specifications because Clark County did not reject the modified opening and approved the window installation. Having addressed Clark County's concerns about the second *Lyons* prong, the circuit court found no disputed facts and held that HGA, Cullen, and MILCO satisfied each prong of the *Lyons* test because: (1) the governmental authority, Clark County, had approved reasonably precise specifications for the windows; (2) the windows met those specifications; and (3) HGA, Cullen, and MILCO knew of no possible danger in the windows that would require them to warn Clark County. Consequently, the court granted the summary judgment motions of HGA, Cullen, and MILCO.

¶ 45. The circuit court also found that the degree of Jankee's contributory negligence precluded his recovery against each of the four defendants as a matter of law. The court ruled that Jankee's conduct must be assessed under the reasonable person standard of care because the exception to that standard articulated by this court in *Gould*, 198 Wis. 2d 450, could not apply to Jankee. The circuit court applied the reasonable person standard and observed that Jankee's elopement was not an impulsive act, but rather "carefully and thoughtfully planned," showing "cleverness and forethought." The court held that under the reasonable person standard, Jankee's negligence exceeded the negligence of each of the four defendants. Consequently, the court granted summary judgment to Clark County, HGA, Cullen, and MILCO on this second issue.

¶ 46. The Jankees appealed the decision. *Jankee*, 222 Wis. 2d at 154. Clark County cross appealed the circuit court's holding that the defense of government contractor immunity shields HGA, Cullen, and MILCO from liability. *Id.*

¶ 47. The court of appeals affirmed the trial court's summary judgments for HGA, Cullen, and MILCO. The court held that under *Lyons*, government contractor immunity offered those three defendants immunity. *Jankee*, 222 Wis. 2d at 172. The court of appeals reversed the summary judgment motion granted to Clark County on the contributory negligence issue. The court concluded that Jankee's contributory negligence should be assessed under a subjective standard of care, not the reasonable person standard. *Id.* at 173, 177. The court declared that the exception to the reasonable person standard created in *Gould* should apply to Jankee because Jankee may have lacked the capacity to appreciate or control his conduct. *Id.* at 177. Having concluded that Jankee's capacity should be at issue under the subjective standard of care, the court decided that facts relating to capacity were in dispute. *Id.* at 178. Therefore, the court remanded the case to the circuit court for a factual finding to determine whether Jankee possessed the capacity to control and appreciate his conduct. *Id.*

## STANDARD OF REVIEW

¶ 48. The review of a summary judgment motion is a question of law that this court considers *de novo*. *Gaertner v. Holcka*, 219 Wis. 2d 436, 445–46, 580 N.W.2d 271 (1998). In our review of the granting of a summary judgment motion, we employ the same methodology as that applied by the circuit court. *Riccitelli v.*

*Broekhuizen*, 227 Wis. 2d 100, 110, 595 N.W.2d 392 (1999). Summary judgment must be entered when a court is satisfied that the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Wis. Stat. § 802.08(2); *Firstar Trust Co. v. First Nat'l Bank of Kenosha*, 197 Wis. 2d 484, 492, 541 N.W.2d 467 (1995). Hence, an appellate court will reverse a summary judgment only if the record reveals that material facts are in dispute or if the circuit court misapplied the law. *See Grzadzielewski*, 159 Wis. 2d at 608.

¶ 49. The pivotal issue here is whether Jankee's conduct should be assessed under the reasonable person standard of care, or under the subjective, or capacity-based, standard of care. We find that no facts relating to Jankee's contributory negligence are in dispute because, as set forth below, we hold that Jankee's conduct must be measured against the reasonable person standard of care. The reasonable person standard is an objective test that takes no account of an individual's capacity. Hence, any issues of fact related to Jankee's capacity to control or appreciate his conduct are not genuine issues material to a resolution here.

¶ 50. Because there are no genuine issues of material fact, we must determine whether the four defendants were entitled to summary judgment as a matter of law. Under Wisconsin law, a plaintiff cannot recover damages if the plaintiff's negligence exceeds the negligence of the party against whom relief is sought. Wis. Stat. § 895.045. Thus, although in other contexts negligence allocation usually is a question for the trier of fact, under the contributory negligence stat-

730

ute it is our duty to bar recovery against a defendant when, as a matter of law, the plaintiff's negligence is greater than the negligence of that particular defendant. *Peters v. Menard, Inc.*, 224 Wis. 2d 174, 193, 589 N.W.2d 395 (1999). If we find, from the undisputed facts, that Jankee's negligence was "so clear and the quantum so great" as to exceed the negligence of the defendants, *Grzadzielewski*, 159 Wis. 2d at 608, we are required to affirm the summary judgment decisions of the circuit court as a matter of law.

## CONTRIBUTORY NEGLIGENCE

■

¶ 51. We first address whether the granting of the summary judgment motions by the circuit court can be upheld as a matter of law. Wisconsin's contributory negligence statute operates as a form of comparative negligence, barring recovery if the negligence of a plaintiff exceeds that of the party from whom the plaintiff seeks recovery. Wis. Stat. § 895.045; *Tucker v. Marcus*, 142 Wis. 2d 425, 432–33, 418 N.W.2d 818 (1988); *Burch*, 198 Wis. 2d at 476. Therefore, if we find that Jankee's negligence was greater than that of the defendants, Wis. Stat. § 895.045 requires us to reverse the court of appeals as a matter of law.

■

¶ 52. Plaintiffs seeking to maintain a negligence action must prove four elements: "(1) A duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury." *Rockweit v. Senecal*, 197 Wis. 2d 409, 418, 541 N.W.2d 742 (1995). The analysis of a negligence claim thus begins with a consideration of the duty of care and

731

the standard to which persons are held in the exercise of that duty.

¶ 53. This court has long recognized that every person owes a duty to the world at large to protect others from foreseeable harm. *Id.* at 420 (citing *Palsgraf v. Long Island R.R.*, 248 N.Y. 339, 350, 162 N.E. 99 (1928) (Andrews, J., dissenting)). The doctrine of contributory negligence acknowledges that the same duty of care obligates persons to exercise ordinary care for their own safety. *Peters*, 224 Wis. 2d at 192 (quoting Wis JI—Civil 1007). "Ordinary care is the degree of care which the great mass of mankind ordinarily exercises under the same or similar circumstances." *Bodoh*, 226 Wis. 2d at 732 (quoting Wis JI—Criminal 1260). A person fails to exercise ordinary care for his or her own safety:

> [W]hen, without intending to do any harm, he or she does something or fails to do something under circumstances in which a reasonable person would foresee that by his or her action or failure to act, he or she will subject a person or property to an unreasonable risk of injury or damage.

*Rockweit*, 197 Wis. 2d at 424 n.7 (quoting Wis JI—Civil 1005). Thus, when a reasonable person knows or should know that a course of conduct poses substantial, inherent risks to him or her, yet the person persists in the conduct voluntarily and suffers injury as a result, the person is negligent and will not be permitted to recover from someone who is less negligent. *Peters*, 224 Wis. 2d at 196–97.

¶ 54. Having set forth our general approach to negligence claims, we next consider whether mentally

disabled persons can be held to the reasonable person, or objective, standard of care. To date, our decisions primarily have explored the standard to which our law holds mentally disabled defendants, not mentally disabled plaintiffs.[9] Wisconsin, like the majority of states, holds mentally disabled defendants to the reasonable person standard of care. *Gould*, 198 Wis. 2d at 456. The

[9] Current Wisconsin jury instructions that address mental disability in the negligence context expressly prohibit jurors from considering mental condition. These instructions are, however, phrased for those situations in which the mentally disabled party is a defendant:

> Evidence has been received (it appears without dispute) that the defendant at the time of (collision, accident, fire, or other alleged tort) was mentally disabled. A person who is mentally disabled is held to the same standard of care as one who has normal mentality, and in your determination of the question of negligence, you will give no consideration to the defendant's mental condition.

Wis JI—Civil 1021. The jury instructions for the definition of negligence creates no distinction for the mentally disabled and holds all persons to the same standard of care:

> A person is negligent when (he) (she) fails to exercise ordinary care. Ordinary care is the care which a reasonable person would use in similar circumstances. A person is not using ordinary care and is negligent, if the person, without intending to do harm, does something (or fails to do something) that a reasonable person would recognize as creating an unreasonable risk of injury or damage to another person or property.

Wis JI—Civil 1005. Similarly, the jury instruction that defines contributory negligence makes no exceptions for the mentally disabled:

> Every person in all situations has a duty to exercise ordinary care for his or her own safety. This does not mean that a person is required at all hazards to avoid injury; a person must, however, exercise ordinary care to take precautions to avoid injury to himself or herself.

Wis JI—Civil 1007.

general rule is that tortfeasors cannot invoke mental capacity as a defense. *Burch*, 198 Wis. 2d at 474. This rule, which holds the mentally disabled liable for their torts, emerged from *Weaver v. Ward*, 80 Eng. Rep. 284 (K.B. 1616), a 17th-Century trespass case sounding in the theory of strict liability. *Gould*, 198 Wis. 2d at 456 (citing W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 135 (5th ed. 1984)).

¶ 55. This court's policy rationales for embracing the rule trace their origins to the 1930s, when we observed that the imposition of liability on the mentally disabled: (1) better apportions loss between two innocent persons to the one who caused the loss, (2) encourages restraint of the disabled, and (3) prevents tortfeasors from feigning incapacity to avoid liability. *Breunig v. American Family Ins. Co.*, 45 Wis. 2d 536, 542, 173 N.W.2d 619 (1970) (citing *Guardianship of Meyer*, 218 Wis. 381, 261 N.W. 211 (1935)).[10]

¶ 56. As we describe below, the application of some of these storied rationales to modern society is strained. Nonetheless, observers today find more contemporary justifications for the general rule. For instance, in an era in which society is less inclined to institutionalize the mentally disabled, the reasonable person standard of care obligates the mentally disabled to conform their behavior to the expectations of the communities in which they live. More practically, the reasonable person standard of care allows courts and juries to bypass the imprecise task of distinguishing

---

[10] *See also* Restatement (Second) of Torts § 283B cmt. b (1965); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 32 (1984).

among variations in character, emotional equilibrium, and intellect.[11]

¶ 57. Despite our endorsement of the general rule, this court fashioned limited defenses for the mentally disabled on two occasions. In the first case, *Breunig*, we concluded that a defendant cannot be found negligent when he or she is suddenly overcome without forewarning by a mental disability or disorder that makes it impossible for the defendant to appreciate the duty to exercise ordinary care or act in an ordinarily prudent manner. *Breunig*, 45 Wis. 2d at 541, 543. This rare exception thus applies only when two conditions are met: (1) the person has no prior notice or forewarning of his or her potential for becoming disabled, and (2) the disability renders the person incapable of conforming to the standards of ordinary care. *Id.* We expressly limited the *Breunig* rule: "All we hold is that a sudden mental incapacity equivalent in its effect to such physical causes as a sudden heart attack, epileptic seizure, stroke, or fainting should be treated alike and not under the general rule of insanity." *Id.* at 544. We later observed that the *Breunig* exception applies only to sudden mental disability, not to more generalized situations in which a person's disability prevents him from controlling his conduct. *Gould*, 198 Wis. 2d at 459.

¶ 58. Although we acknowledged an exception in *Breunig*, we held that the exception did not apply to the

---

[11] *See generally* Restatement (Second) of Torts § 283B cmt. b; *Prosser and Keeton on the Law of Torts* §§ 32 and 135; James W. Ellis, *Tort Responsibility of Mentally Disabled Persons*, 1981 Am. B. Found. Res. 1079, 1083–84; Harry J.F. Korrell, *The Liability of Mentally Disabled Tort Defendants*, 19 Law & Psychol. Rev. 1, 26–29 (1995).

defendant in that case, Erma Veith. Mrs. Veith argued that she could not be held liable for an accident because, just prior to the collision, she suffered a sudden aberration that caused her to believe that her car could fly because Batman's vehicle could fly. *Breunig*, 45 Wis. 2d at 539. We found that she had forewarning of her condition. One year earlier, Mrs. Veith had experienced delusional visions. *Id.* at 544–45. Consequently, this court concluded that Mrs. Veith should have appreciated the risk she posed to others if she drove. *Id.* at 545. As a result, under the first of the two conditions that must coexist for the exception to apply, Mrs. Veith's prior notice of her potential for becoming disabled left the *Breunig* exception inapplicable to her defense.[12]

---

[12] This level of forewarning is acutely apparent for persons who are under the treatment of medication. For instance, epileptics and diabetics are negligent if a foreseeable seizure or incapacitation leads them to cause an accident. *See Breunig v. American Family Ins. Co.*, 45 Wis. 2d 536, 541–42, 173 N.W.2d 619 (1970) (citing *Eleason v. Western Cas. & Sur. Co.*, 254 Wis. 134, 135 N.W.2d 301 (1948) and *Wisconsin Natural Gas Co. v. Employers Mut. Liability Ins. Co.*, 263 Wis. 633, 58 N.W.2d 424 (1953)).

A case from another jurisdiction is even more illustrative. In *Stuyvesant Assoc. v. John Doe*, 534 A.2d 448 (N.J. Super. Ct. Law Div. 1987), a New Jersey appellate court assessed the liability of a schizophrenic man who committed vandalism during a psychotic episode. The patient had been receiving injections of prolixin decanate every other week. *Id.* at 449. The medication permitted him to function well enough to live alone. *Id.* His psychiatrist testified that if the patient missed the dose, within ten days he would become delusional, "driven by inner voices," and unable to control his behavior. *Id.* Moreover, the patient knew deterioration would result from a skipped injection, and he was aware of the risks he posed when he fell into a psychotic

¶ 59. In the second case, *Gould*, we created an exception for the liability of mentally disabled persons in institutionalized settings who do not have the capacity to control or appreciate their conduct when they cause injury to caretakers employed for financial compensation. *Gould*, 198 Wis. 2d at 453. The *Gould* exception is narrow. It was articulated for a severely disabled defendant suffering from Alzheimer's Disease who injured a nurse in a health care facility. We did not design the exception to apply broadly in a variety of settings against a variety of plaintiffs. *See Burch*, 198 Wis. 2d at 473. Thus, on the same day this court decided *Gould*, we stressed in *Burch* that the mentally disabled generally are held to the reasonable person standard of care. *Id.*

¶ 60. The *Gould* exception consists of structured requirements. The person must be institutionalized, the person must have a mental disability, the person must lack the capacity to control or appreciate his or her conduct, and the person must have committed an injury to a caretaker employed for financial compensation. *Gould*, 198 Wis. 2d at 453. In the present case, the

state. *Id.* The patient missed an appointment for the medication, and he caused the damage at issue during the subsequent decompensation. *Id.* The court held the defendant to an objective standard of care and found him liable, reasoning that the patient was cognizant of his condition and the risks posed by refraining from the medication:

> A reasonable person under the same circumstances as this defendant would be expected to get the injections as scheduled. Not having done so, he allowed himself to become psychotic, with the resulting damage done by his own hands. He is liable for the consequences of that conduct.

*Id.* at 450.

court of appeals eliminated one of the parts of the four-part *Gould* test, namely injury to a caretaker.[13] Moreover, it focused on the "capacity" element, despite Jankee's forewarning of incapacitation if he did not take his medication and his undisputed history of medication noncompliance.

¶ 61. We explicitly observed in *Gould* that the exception created therein does not apply to more expansive situations in which a person generally is unable to control his or her conduct. *Gould*, 198 Wis. 2d at 459. In both *Breunig* and *Gould*, this court chose not to adopt broader exceptions to the general rule that holds the mentally disabled defendant to an objective standard of care.

¶ 62. Expansion of the narrow *Gould* exception to other circumstances based on a party's capacity to control or appreciate conduct would eviscerate the common law rule.[14] We reject an extension of the *Gould* exception in a manner that would allow the mentally disabled to raise a defense based on a more generalized capacity to control conduct. A truncated rule of this sort would invite parties suffering from varying degrees of permanent or temporary impair-

[13] In limiting the *Gould* exception to cases involving paid caretaker plaintiffs, the court explained that Mrs. Gould was employed as a caretaker specifically for dementia patients and knowingly encountered the dangers associated with such employment. The court analogized her position to that of a firefighter who is injured when called to extinguish a fire caused by negligence. *Gould*, 198 Wis. 2d at 461–62 (citing *Hass v. Chicago & N.W. Ry.*, 48 Wis. 2d 321, 179 N.W.2d 885 (1970)).

[14] *See* Ellis, *Tort Responsibility of Mentally Disabled Persons* at 1084 (citing Restatement (Second) of Torts § 283B cmt. b.1).

ment to escape responsibility while concurrently compelling the trier of fact to assume the role of expert, able to distinguish among discrete, complex behaviors. *Gould*, 198 Wis. 2d at 459–60.

¶ 63. The *Breunig* and *Gould* exceptions, we stress, are limited. In those situations in which conduct does not fall within those precise exceptions, we continue to hold defendants to the reasonable person standard of care. *See Burch*, 198 Wis. 2d at 473.

¶ 64. Our inquiry about the standard of care does not end at this point, however, because this case is distinguishable from *Breunig* and *Gould* in one critical respect. Unlike either of the defendants in *Breunig* or *Gould*, Jankee appeared before the circuit court as a plaintiff in a negligence claim. The court of appeals acknowledged this distinction when it noted that the *Gould* court had addressed the liability of a tortfeasor, not the contributory negligence of a plaintiff. *Jankee*, 222 Wis. 2d at 175. We therefore next address the standard of care to which a mentally disabled plaintiff must be held when a defendant raises an affirmative defense of contributory negligence.

¶ 65. The court of appeals in this case relied on *Wright v. Mercy Hospital of Janesville, Wisconsin, Inc.*, 206 Wis. 2d 449, 557 N.W.2d 846 (Ct. App. 1996), for its analysis of the contributory negligence of a mentally disabled plaintiff. In *Wright*, a psychiatric patient pursued a medical malpractice claim against a health care facility after she and a caregiver engaged in a sexual relationship during the course of her treatment. At trial, the hospital asked the court to submit a jury question about the plaintiff's contributory negligence. *Id.* at 463. The circuit court refused, and on appeal, the

court of appeals invoked the *Gould* exception to affirm the circuit court. *Id.* at 463–64.[15]

¶ 66. The *Wright* court applied the *Gould* exception without addressing the difference in the standard of care to which mentally disabled persons must be held when they appear before a court as defendants and when they are postured as plaintiffs. *Id.* In the present case, the court of appeals recognized the significance of the distinction, *Jankee,* 222 Wis. 2d at 177, but it relied on *Wright* without undertaking its own analysis to explore the standard to which the mentally disabled are held. Thus, although *Jankee* and *Wright* both focus on the contributory negligence of the mentally disabled, neither case fully develops the distinction between the contributory negligence of a plaintiff and the liability of a defendant.

¶ 67. The distinction is not immaterial. Although the general rule holds mentally disabled defendants to the reasonable person standard of care, some jurisdictions apply a subjective standard of care when the mentally disabled person seeks recovery as a plaintiff.[16]

_____

[15] The court of appeals reasoned that *Gould* applied because the *Wright* plaintiff was an institutionalized person with a mental disability unable to control or appreciate her conduct and therefore was not liable for injuries she sustained while the hospital was employed as her caregiver. The court agreed with the circuit judge who asked: "How can a patient negligently receive treatment?" *Wright v. Mercy Hosp. of Janesville, Wis., Inc.*, 206 Wis. 2d 449, 463–64, 557 N.W.2d 846 (Ct. App. 1996).

[16] Section 464 of the Restatement, "Standard of Conduct Defined," takes no position on this question: "The Institute expresses no opinion as to whether insane persons are or are not required to conform for their own protection to the standard of conduct which society demands of sane persons." Restatement

¶ 68. Before the court of appeals decision in this case, Wisconsin had not recognized a difference in the standard of care to which our law holds mentally disabled plaintiffs and mentally disabled defendants. We did not reach the issue of the contributory negligence of a mentally disabled person in *Breunig*, 45 Wis. 2d at 544. In other jurisdictions, however, two distinct standards have emerged for mentally disabled plaintiffs. In some jurisdictions, a mentally disabled plaintiff is assessed under the subjective, or capacity-based, standard of care; in other jurisdictions, a mentally disabled plaintiff is held to the reasonable, or objective, standard of care. *See generally* James W. Ellis, *Tort Responsibility of Mentally Disabled Persons*, 1981 Am. B. Found. Res. J. 1079, 1090–91 (1981).

¶ 69. The subjective standard may have emerged as an attempt to modify the historically harsh results of contributory negligence, which operated as a total bar to recovery for plaintiffs found even partially responsible for their own injuries. *Id.* at 1091–92; Stephanie I. Splane, Note, *Tort Liability of the Mentally Ill in Negligence Actions*, 93 Yale L. J. 153, 157 (1983). Strict application of a contributory negligence rule that precludes relief to plaintiffs who have shown minimal fault can appear inequitable when applied to persons who lack average intelligence and capacity. Ellis, *Tort Responsibility of Mentally Disabled Persons* at 1990–91. Thus, the subjective standard of care is highly suited to jurisdictions that still apply the pure, rather than the comparative, form of contributory negligence, because the subjective standard allows juries to apply equitable principles to set a plaintiff's recovery. Alison P. Raney, *Stacy v. Jedco Construction, Inc.:*

(Second) of Torts, Caveat to § 464. *See also Prosser and Keeton on the Law of Torts* § 135.

*North Carolina Adopts a Diminished Capacity Standard for Contributory Negligence*, 31 Wake Forest L. Rev. 1215, 1234 (1996).

¶ 70. Some courts have applied the subjective standard of care to mentally disabled plaintiffs, concluding that the policy rationales that underlie the reasonable person standard for mentally disabled defendants do not mesh with cases of contributory negligence.[17] For instance, the first rationale for a reasonable person standard for mentally disabled defendants is that "where a loss must be borne by one of two innocent persons, it shall be borne by him who occasioned it." *Gould*, 198 Wis. 2d at 461 (quoting *Meyer*, 218 Wis. at 385). In a negligence suit, however, the mentally disabled plaintiff alleges that the defendant is not "innocent." When the defendant answers that the plaintiff contributed to his own injury, the defendant asserts, in effect, that neither party is "innocent." Hence, the first rationale appears not to apply. Nevertheless, this rationale rests on the theory that the mentally disabled should compensate victims for the harms they cause. Splane, *Tort Liability of the Mentally Ill* at 156. In a contributory negligence context, the mentally disabled plaintiff is at least one cause of his or her own injury. The modern comparative contributory negligence scheme allocates damages by determining the extent to which the parties are at fault. A subjective standard for contributory negligence complicates the work of the fact finder in allocating

---

[17] Restatement (Second) of Torts § 464 cmt. g; *Prosser and Keeton on the Law of Torts* § 32; Ellis, *Tort Responsibility of Mentally Disabled Persons* at 1091; Stephanie I. Splane, *Tort Liability of the Mentally Ill in Negligence Actions*, 93 Yale L.J. 153, 157–58, 169 (1983).

fault for one party is being assessed by an objective standard while the other is being judged by a subjective standard which attempts to discern the plaintiff's capacity.

■

¶ 71. The second rationale imposes liability so that "those interested in the estate of the insane person, as relatives or otherwise, may be under inducement to restrain him." *Gould*, 198 Wis. 2d at 462 (quoting *Meyer*, 218 Wis. at 385). This rationale encourages relatives and guardians to take measures to protect the mentally disabled's assets, and thus their inheritance, from the effects of tort liability. Ellis, *Tort Responsibility of Mentally Disabled Persons* at 1084. The "caretaker" rationale has been widely criticized as an anachronism originating in an eugenical era because it promoted incentives for relatives and guardians to isolate the mentally disabled in institutions.[18] This second rationale should not serve as the foundation for any modern policy decisions. Ironically, however, the subjective standard creates incentives for potential defendants such as CCHCC, to intensify security considerations for the mentally disabled, not to protect the disabled but rather to protect themselves from liability. As an example, one way for CCHCC to reduce the threat of liability for a patient's attempted escape would be to restore bars to all windows in the facility. This response might reduce the risk of liability but would not represent sound therapeutic policy for patients.[19]

---

[18] Ellis, *Tort Responsibility of Mentally Disabled Persons* at 1084–85; Splane, *Tort Liability of the Mentally Ill* at 156 n.20.

[19] In *Payne v. Milwaukee Sanitarium Found., Inc.*, 81 Wis. 2d 264, 270, 260 N.W.2d 386 (1977), the court said:

¶ 72. The third rationale holds the mentally disabled accountable for their torts to prevent defendants "from simulat[ing] or pretend[ing] insanity to defend their wrongful acts." *Gould*, 198 Wis. 2d at 462 (quoting *Meyer*, 218 Wis. at 385). This rationale implies conscious strategy. It is unlikely that a person would consciously put himself or herself in harm's way with the notion that, if injured, the person could later invoke incapacity to control conduct as a defense. Both the injury itself and the stigma attached to mental illness would probably deter such a strategy. Therefore, this rationale does not support an objective standard in a contributory negligence context. There is, however, a counter-argument. Scientists increasingly acknowledge the imprecision inherent in the diagnosis of mental disability.[20] Although it is unlikely that a mentally disabled person will simulate insanity before an injury, it is not unlikely that a mentally disabled plaintiff will try to overstate the extent of his or her disability to avoid the ramifications of his or her con-

It was not too long ago that hospitals for the mentally ill were known as asylums for the insane. Emphasis was upon the custodial aspect of the institutionalization—barred windows, locked doors, straitjackets and physical restraint to prevent inmates from harming themselves or others.

Today, with more known about the cause and cure of mental illness, the mental hospital has become primarily a treatment facility. While maximum security units are retained, the primary emphasis is now upon therapy and rehabilitation. An attending psychiatrist's order that a particular patient be assigned to an open or closed unit represents a balance of both protection and treatment.

[20] Restatement (Second) of Torts § 283B cmt. b(2); Ellis, *Tort Responsibility of Mentally Disabled Persons* at 1086–87; Splane, *Tort Liability of the Mentally Ill* at 156, n.19.

tributory negligence. Because of the imprecision of diagnosis, such a strategy may succeed, especially in a setting in which the fact finder may look upon the injured plaintiff with heightened sympathy.

¶ 73. The common law does not automatically exonerate mentally disabled plaintiffs from contributory negligence. Only a plaintiff "who is so insane or devoid of intelligence as to be totally unable to apprehend danger and avoid exposure to it is not a responsible human agency and cannot be guilty of contributory negligence." 57A Am. Jur. 2d *Negligence* § 954 (1989); *see also* 65A C.J.S. *Negligence* § 141 (1966). The mentally disabled whose impairments fall short of insanity still can be found contributorily negligent. Restatement (Second) of Torts, § 464 cmt. g. Consequently, some jurisdictions apply the reasonable person standard of care to mentally disabled plaintiffs who are not absolutely incapable of appreciating danger.[21] Other jurisdictions acknowledge that plaintiffs

---

[21] *See Hobart v. Shin*, 705 N.E.2d 907, 912–13 (Ill. 1998) (holding mentally disabled suicide victim to reasonable person standard); *Cooper v. County of Florence*, 385 S.E.2d 44, 46 (S.C. Ct. App. 1989), *rev'd on other grounds*, 412 S.E.2d 417 (S.C. 1991) (observing that for subjective standard to apply, the plaintiff's mental capacity must be diminished to a degree that makes the plaintiff totally unable to appreciate danger); *Galindo v. TMT Transp., Inc.*, 733 P.2d 631 (Ariz. Ct. App. 1986) (holding that ordinary standard of care determines whether a mentally disabled plaintiff can be contributorily negligent); *Macon-Bibb County Hosp. Auth. v. Appleton*, 181 S.E.2d 522 (Ga. Ct. App. 1971) (finding that plaintiff who had received treatment for mental disturbance should be held to reasonable person standard for injuries sustained during fall from seventh floor during an escape attempt because plaintiff was aware of the grave peril); *Wright v. Tate*, 156 S.E.2d 562, 565 (Va. 1967) (adopting the Restatement approach and holding that a plain-

cannot invoke mental disability to extinguish a defense of contributory negligence, but nonetheless allow the jury to weigh degrees of mental capacity in assessing whether an injured plaintiff was contributorily negligent.[22] This latter, majority group of states favors a subjective standard of care. The subjective standard is well suited for situations in which a tortfeasor is aware

tiff with some diminished mental capacity should be held to the reasonable person standard); *see also* Ellis, *Tort Responsibility of Mentally Disabled Persons* at 1092–96.

[22] *Stacy v. Jedco Constr., Inc.*, 457 S.E.2d 875, 879 (N.C. Ct. App. 1995) (holding that an injured plaintiff with a diminished mental capacity that does not amount to total insanity can be found contributorily negligent, but nonetheless should be held to a subjective standard of care); *Birkner v. Salt Lake County*, 771 P.2d 1053, 1060 (Ut. 1989); *Cowan v. Doering*, 545 A.2d 159, 163 (N.J. 1988) (adopting a capacity-based standard and comparing it to the standard applied to infants); *Mochen v. State*, 43 A.D.2d 484, 487–88 (N.Y. 1974) (mentally disabled plaintiff who sustained injuries when she fell from a window during an escape attempt should be held to subjective standard that measures the degree to which he or she can exercise the duty of self-care); *De Martini v. Alexander Sanitarium, Inc.*, 192 Cal. App. 2d 442, 447 (1961) (allowing jury instruction for contributory negligence of a patient injured while climbing over and falling from a wall surrounding the hospital during an escape attempt); *See also Prosser and Keeton on the Law of Torts* § 135 (noting that "[a]t least in cases in which the defendant knows he is dealing with a person of defective mental capacity, a more beneficent standard has been applied"); W.C. Crais III, Annotation, *Comment Note—Contributory Negligence of Mentally Incompetent or Mentally or Emotionally Disturbed Person*, 91 A.L.R.2d 392, § 4[b] (1963); 57 Am. Jur. 2d *Negligence* § 956 (1989); Splane, *Tort Liability of the Mentally Ill* at 155–58; Alison P. Raney, *Stacy v. Jedco Construction, Inc.: North Carolina Adopts a Diminished Capacity Standard for Contributory Negligence*, 31 Wake Forest L. Rev. 1215, 1226–31 (1996).

of the plaintiff's diminished mental capacity and can take precautions against the disability. *Prosser and Keeton on the Law of Torts* §§ 32, 135.

¶ 74. Nonetheless, several arguments support the objective standard of care for mentally disabled plaintiffs. Prosser and Keeton note that the policy rationales underpinning the subjective standard of care are not as evident as those for the reasonable person standard. *Id.* at § 32; Restatement (Second) of Torts § 464 cmt. g.[23] Application of a subjective standard for partially disabled individuals whose capacity falls short of total insanity presents administrative difficulties. *Gould,* 198 Wis. 2d at 459–60. These difficulties include the possibility of fraudulent claims that result from feigned insanity, problems defining the degree of disability sufficient to qualify for the subjective standard, and issues similar to those that have arisen for the criminal insanity defense.[24] Ellis, *Tort Responsibility of Mentally Disabled Persons* at 1091, 1095–96. Some commentators suggest that the objec-

[23] *See also* Ellis, *Tort Responsibility of Mentally Disabled Persons* at 1091–92; Splane, *Tort Liability of the Mentally Ill* at 157–58.

[24] At oral argument, counsel for Clark County explained that this case raises the policy question of whether Jankee feigned insanity. Counsel suggested Jankee and his wife may have planned the escape together. Jankee's wife called CCHCC before 6:45 the morning Jankee was found and, instead of asking how Jankee was doing, asked "Is Emil there?" Because we find Jankee contributorily negligent under the reasonable person standard of care, we do not address whether the possibility of feigned insanity should prevent us from applying the subjective standard of care to Jankee.

tive standard is better suited to situations in which the mental disability is foreseeable and treatable.[25]

¶ 75. Other assessments clarify how the reasonable person standard of care better comports with the role of the mentally disabled in contemporary society. The objective standard promotes the integration of the mentally disabled into the community: By informing the mentally disabled that a foreseeable illness will not absolve liability, society will encourage the mentally disabled to make full use of the mental health system.[26] This integration is particularly desirable in a culture that favors deinstitutionalization. Splane, *Tort Liability of the Mentally Ill* at 166.

¶ 76. We are not persuaded that this is the case in which to adopt a subjective standard of care for mentally disabled plaintiffs. We acknowledge that the subjective standard may be appropriate for a plaintiff who is suddenly and unpredictably overcome with a mental disorder and was never able to foresee or appreciate risk. *See Breunig*, 45 Wis. 2d at 541, 543–44.[27] The subjective standard is not appropriate, however, for cases in which a person's decompensation is predictable, for cases in which a plaintiff can modify his or her

[25] Elizabeth J. Goldstein, *Asking the Impossible: The Negligence Liability of the Mentally Ill*, 12 J. Contemp. Health L. & Pol'y 67, 85–88 (1995) (citing William M. Landes & Richard A. Posner, *The Economic Structure of Tort Law* 130 (1987)).

[26] Goldstein, *Asking the Impossible:* at 88–89 (citing Splane, *Tort Liability of the Mentally Ill* at 162–63); Daniel W. Schuman, *Therapeutic Jurisprudence and Tort Law: A Limited Subjective Standard of Care*, 46 SMU L. Rev. 409, 419–20 (1992).

[27] *See also* Goldstein, *Asking the Impossible* at 86 (citing Landes & Posner, *The Economic Structure of Tort Law* at 130).

conduct and prevent injury by pursuing and maintaining a course of medication and treatment.

¶ 77. Emil Jankee suffered from a foreseeable and treatable illness. He is not like Roland Monicken, the Alzheimer's patient in *Gould*, whose dementia was permanent and digressive. Jankee's situation is tragic, but it does not warrant a fundamental change in Wisconsin law.

¶ 78. Because we have determined not to adopt new law, we review Jankee's situation in the light of the two previously recognized exceptions to the objective standard, namely the exceptions allowed by *Gould* and *Breunig*. The *Gould* exception cannot apply here because Jankee did not injure a caretaker employed for financial compensation. The *Gould* case is simply inapplicable.

¶ 79. The *Breunig* exception to the objective standard requires that two conditions be met: (1) the person had no prior notice or forewarning of his or her potential for becoming disabled, and (2) the disability renders the person incapable of conforming to the standards of ordinary care. These conditions are clearly pertinent in assessing the contributory negligence of a plaintiff.

¶ 80. We first examine whether Jankee had forewarning of the potential for becoming disabled. Jankee had forewarning. He had received warnings during the two 1984 hospitalizations and subsequent outpatient visits that medication noncompliance would spark an episode of disability. He nonetheless voluntarily suspended the treatments. At both hospitalizations, doctors stressed that his continued improvement was contingent upon compliance with medication. Jankee understood that failure to continue the treatment would cause a relapse. Jankee himself observed that he

must take the medication for life, and he likened lithium to the insulin a diabetic receives. At Jankee's discharge from the second hospitalization, staff once more warned that Jankee's condition would deteriorate in the event of medication noncompliance.

¶ 81. Medication made it possible for Jankee to control his conduct. Norwood records remarked that Jankee's condition was good when he complied with the medication. Jankee's medical expert, Dr. Soo Hoo, testified that had Jankee taken the medication, he probably would have been in an improved condition. The proper medication could control Jankee's condition, and had he maintained the recommended treatments, Jankee would not have been as likely to have been hospitalized at CCHCC.

¶ 82. Allowing Jankee to recover would frustrate the policy of encouraging the mentally disabled to seek and maintain a course of medication and treatment. The introduction of modern psychiatric medications and therapies makes it possible for the mentally disabled to control their conduct, rendering it less tenable to conclude that the mentally disabled are incapable of gauging harmful behavior. Splane, *Tort Liability of the Mentally Ill* at 168. Like Mrs. Veith, the mentally disabled defendant in *Breunig*, a patient who is aware of his or her illness knows the risks presented by the condition.

¶ 83. Jankee understood, since at least 1984, that failure to comply with his prescribed medications would be dangerous and detrimental to his mental health. We favor a policy that encourages the mentally disabled to seek, not reject, treatment.[28] Were Jankee

[28] Studies increasingly show that mental illnesses like bipolar disorder respond predictably well to psychopharmacological treatment. Bruce J. Winick, *Ambiguities in the Legal Meaning*

to prevail here, we would be promoting an environment that allows the mentally disabled to cease treatment for foreseeable illnesses and then to pursue recovery for self-inflicted injuries under an insulating theory that effectively excuses them from the consequences of their own negligence. We decline to reward a plaintiff for choosing this course of action.

¶ 84. We now turn to the second *Breunig* condition, namely whether the disability made it impossible to appreciate the duty of ordinary care or to act in an ordinarily prudent manner. Even if we were to find that Jankee lacked prior notice of his illness, leading us to analyze this second conjunctive condition, Jankee still would be found contributorily negligent to a disqualifying degree if we concluded that the disability did not render him incapable of conforming his conduct to the standards of ordinary care.

¶ 85. Jankee's conduct reveals that he did in fact appreciate the duty of ordinary care. Jankee was not so incapacitated as to be "totally unable to apprehend danger and avoid exposure to it." *See* 57A Am. Jr. 2d *Negligence* § 954.[29] On the contrary, Jankee took mea-

---

*and Significance of Mental Illness*, 1 Psychol. Pub. Pol'y & L. 534, 559 (1995). Moreover, "[m]any people suffering from mental illness, even psychosis, are still able to make their own hospitalization and treatment decisions." *Id.* at 586. "Clinical evidence suggests that despite alterations in thinking and mood, psychiatric patients are not automatically less capable than others of making health care decisions." *Id.* at 586 n.212 (quoting Karen McKinnon et al., *Rivers in Practice, Clinicians' Assessments of Patients' Decision-Making Capacity*, 40 Hosp. & Community Psychiatry 1159, 1159 (1989)).

[29] Again, even states that apply the subjective standard to mentally disabled plaintiffs refuse to absolve them from contributory negligence unless the plaintiff can show "that he could

sures to ensure his own safety, and he actively apprehended the danger. Jankee's CCHCC room had three windows. He chose to elope from the south window overlooking a flat roof, a landing only about two or three feet below the windowsill. This choice, Jankee conceded, lowered the risk of injury because it provided a safer way to exit than the three-story drop from the other two windows. Jankee acknowledged that a jump from an east window would be dangerous and probably kill him. After all, he remarked, "That would be suicide." Once on the roof, he planned to move along a ledge to a height from which he could jump to the ground safely. Jankee knew the substantial risk of a three-story fall, and he should have known that attempting to scale down a building could provoke serious injury or even death.

¶ 86. Furthermore, Jankee took measures like those of an ordinarily prudent person acting to conceal an illicit activity, and he evinced a piqued level of planning and cognizant dexterity. As a whole, Jankee's conduct suggests his impairment fell "short of insanity," and indicates he was not "devoid of intelligence." *See* Restatement (Second) of Torts § 464 cmt. g; 57A Am. Jur. 2d *Negligence* § 954; *see also* 65A C.J.S. *Negligence* § 141. Jankee noticed that the south window opened about four inches several days before he eloped. On the day of the escape attempt, he made efforts not to arouse the suspicion of CCHCC staff. He anticipated a bed check and testified that he wanted to "fool" staff and "cover[ ] his tracks" by adjusting the pillows on his bed so that it would appear as if he were in his room. He drew the divider curtain closed and turned off his room light. He transformed a toothbrush

---

not have taken the actions necessary for his protection." Ellis, *Tort Responsibility of Mentally Disabled Persons* at 1094.

into a wrench with which to turn the cube stop. Jankee worked on this plan for 15 to 20 minutes. He removed his shirt to make it easier for him to slide through the window.

¶ 87. Finally, Jankee's reaction to and description of the accident indicate Jankee appreciated the duty of ordinary care. When he was found lying on the ground, Jankee apologized to the nurse. At his 1993 deposition, Jankee explained his motivations and the execution of his escape plan with a clarity that suggests the incident was the product of a lucid plan. Jankee's behavior, his remorse for the conduct, and his effective recollection of events that occurred four years earlier belie the conclusion that the escape was the product of a sudden mental illness.

¶ 88. We hold, therefore, that under the reasonable person, objective standard of care, Jankee's own negligence exceeded that of any of the defendants as a matter of law for two reasons. First, Jankee was contributorily negligent because he failed to comply with his medication program. Modern medicine encourages the mentally disabled to pursue treatment programs that can result in long-term recovery. Under the reasonable person standard of care, a person who understands that ceasing medication will spark a relapse should be accountable for his or her own contributory fault and should not be rewarded for stopping the treatment.

¶ 89. Second, under the reasonable person standard of care, Jankee was the major cause of his own injuries. Our courts deny recovery to parties who are the major cause of their own injuries. *Peters*, 224 Wis. 2d at 195 (quoting *Grzadzielewski*, 159 Wis. 2d at 610). The circuit court found Jankee's conduct clever and

thoughtfully planned, and the court concluded that "there is no doubt that he placed himself in considerable risk." We agree. Jankee appreciated the duty to exercise ordinary care. He foresaw the inherent risk of his actions, and he apprehended that the conduct was dangerous. The degree of planning and careful execution demonstrates that although this may have been an impulsive act, as Jankee himself contends, it was not the result of sudden mental incapacity.

¶ 90. We therefore hold that Wisconsin's contributory negligence statute, Wis. Stat. § 895.045, bars Jankee's recovery as a matter of law because his negligence exceeded the negligence of each of the defendants.

## CUSTODY AND CONTROL

¶ 91. We next consider whether Clark County's custody and control of Jankee created a duty for the County that overrode Jankee's duty to exercise ordinary care for his own safety. The Jankees do not explicitly argue that Jankee's confinement gave rise to a special relationship between Clark County and Jankee. They submit, however, that CCHCC inadequately policed Jankee's ward, failed to maintain close observation over him, and neglected to perform its routine, custodial duties in the course of caring for Jankee. Were we to find that Clark County owed Jankee a heightened duty of care to prevent a foreseeable escape attempt, Jankee still could recover from Clark County despite our holding that his contributory negligence exceeded the negligence of Clark County and other defendants as a matter of law. We do not come to this conclusion, however, because although Clark County had a special, protective relationship with Jankee,

CCHCC had no reason to know that Jankee was an elopement risk.

¶ 92. As a general rule, Wisconsin, like most jurisdictions, does not impose a duty on a person to stop a third person from committing harm to another or to himself or herself. *Schuster v. Altenberg*, 144 Wis. 2d 223, 238 n.3, 424 N.W.2d 159 (1988). Nonetheless, certain caregivers, such as hospitals and prisons, assume enhanced responsibilities in protective or custodial situations. Restatement (Second) of Torts § 315.[30] This increased duty obligates the caregiver to shield the protected person from the foreseeable consequences of injurious conduct. *See McMahon v. St. Croix Falls Sch. Dist.*, 228 Wis. 2d 215, 226, 596 N.W.2d 875 (Ct. App. 1999). When such a special relationship exists, the caregiver assumes the duty to provide reasonable care of the protected person to prevent harm. Restatement (Second) of Torts § 319.[31] This assumption of duty may absolve the protected person from the ordinary obliga-

---

[30] Restatement (Second) of Torts § 315 provides:

There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection.

*See also* Wis. Stat. § 940.295 (1997–98). This statute, first enacted in 1994 and modified twice thereafter, authorized criminal penalties for the negligent "neglect" of a patient in an inpatient health care facility.

[31] Restatement (Second) of Torts § 319 provides:

One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is

tion of self-care, shift responsibility to the caregiver, and thereby expunge the affirmative defense of contributory negligence.[32]

¶ 93. Under this approach, therefore, a plaintiff must show that: (1) a special relationship existed, giving rise to a heightened duty of care; and (2) the defendant caregiver could have foreseen the particular injury that is the source of the claim.[33] If the special relationship existed but the defendant caregiver could not have foreseen the particular injury, the affirmative defense of contributory negligence reenters the equation. Even if the particular injury were foreseeable, the defense of contributory negligence should not be expunged if the defendant's exercise of care was not only reasonable but also fully responsive to the heightened duty with which the caregiver was charged.

¶ 94. We first consider whether Clark County established a special relationship with Jankee. A person owes no duty to aid or protect a third party unless the person stands in a special relationship to the foreseeable victim. *Schuster*, 144 Wis. 2d at 238 n.3. This general rule reflects our· adoption of § 314A of the Restatement (Second) of Torts.[34] Subsection (4) provides: "One who is required by law to take or who

under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

[32] *See* Charles J. Williams, *Fault and the Suicide Victim: When Third Parties Assume a Suicide Victim's Duty of Self-Care*, 76 Neb. L. Rev. 301, 305–06 n. 25 (1997).

[33] *See generally* Williams, *Fault and the Suicide Victim* at 304.

[34] Section 314A of the Restatement (Second) of Torts (1965) provides that special relations giving rise to a duty to aid or protect arise in the following situations:

voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other." Hospital and prison settings often fall under § 314A because they alter expectations of responsibility for safety and frequently deprive people of their normal opportunities for protection. Thus, a special relationship exists between an involuntarily committed person and the state. *Kara B. v. Dane County*, 198 Wis. 2d 24, 36 n.3, 542 N.W.2d 777 (Ct. App. 1995), *aff'd* 205 Wis. 2d 140, 150, 555 N.W.2d 630 (1996) (citing *Youngberg v. Romeo*, 457 U.S. 307 (1982)). In this case, a special relationship arose because the court confined Jankee involuntarily to CCHCC.

¶ 95. Having concluded that Clark County established a special relationship with Jankee, we next address whether CCHCC could have foreseen Jankee's escape attempt. A hospital "is not an insurer of its patients against injury inflicted by themselves," *Dahlberg v. Jones*, 232 Wis. 6, 11, 285 N.W. 841 (1939), but is only required to use such means to restrain and

(1) A common carrier is under a duty to its passengers to take reasonable action
 (a) to protect them against unreasonable risk of physical harm, and
 (b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.

(2) An innkeeper is under a similar duty to his guests.

(3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.

(4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.

guard its patients as would seem reasonably sufficient to prevent foreseeable harms. *Id.* Thus, the duty of a hospital is to exercise such ordinary care as the hospital knows, or should know, the patient's mental or physical condition requires. *Kujawski v. Arbor View Health Care Ctr.*, 139 Wis. 2d 455, 462–63, 407 N.W.2d 249 (1987).

¶ 96.　The duty of a hospital to take special precautions for particular patients arises in only certain situations. After all, modern hospitals treating persons with mental disabilities focus on therapy and rehabilitation, not maximum security. *Payne v. Milwaukee Sanitarium Found.*, 81 Wis. 2d 264, 270, 260 N.W.2d 386 (1977). A duty to restrain or guard a specific patient emerges only when a hospital has "knowledge of the propensity or inclination of the patient to injure (himself) (herself) or escape." Wis JI—Civil 1385.5; *see also* Wis JI—Civil 1385.

¶ 97.　No cause of action arises unless the hospital has notice of an individual patient's disposition to inflict self-injury. *Bogust v. Iverson*, 10 Wis. 2d 129, 136–37, 139–40, 102 N.W.2d 228 (1960). Thus, a hospital is under no duty to take special precautions when there is no reason to anticipate one patient's escape or suicide. *Dahlberg*, 232 Wis. at 11. If a caregiver is unaware of a patient's propensity for self-injury, the caregiver cannot assume the patient's duty of self-care.[35]

¶ 98.　This court has found in the past that hospitals cannot be liable for the unforeseeable actions of

---

[35] Williams, *Fault and the Suicide Victim* at 311.

their patients. For example, we upheld a directed verdict for a defendant hospital when a voluntarily committed woman with no history of escape or suicide suffered injuries after she fled the facility by exiting through a window. *Id.* at 11–12.[36] Absent notice that a particular patient is inclined to execute a suicide attempt, a hospital is not negligent, as a matter of law, if the patient, after being ordered to be left unattended, uses that freedom to exit a ward and harm himself or herself. *Payne*, 81 Wis. 2d at 274.

¶ 99. We therefore must focus on whether CCHCC could have foreseen that Jankee would attempt to escape. CCHCC took measures consistent with the standard of ordinary care that hospitals owe

---

[36] Distinctions exist between those persons who are committed because they are dangerous to themselves, and those who risk causing danger to others. *See* Winick, *Ambiguities in the Legal Meaning and Significance of Mental Illness* at 585–86. When hospitals admit patients with suicidal tendencies, they assume the duty of care those patients otherwise owe to themselves to prevent harm. *See* Williams, *Fault and the Suicide Victim* at 305–06. Similarly, "where immediately prior to an attempted suicide the patient had spent a sleepless night, exhibited bizarre behavior, including delusions, and had repeatedly stated that she must leave the hospital and would not obey the nurse's orders," hospital staff were under a heightened duty of care to place the patient under constant supervision. *Payne*, 81 Wis. 2d at 274–75 (citing *Mounds Park Hosp. v. Von Eye*, 245 F.2d 756 (8th Cir. 1957)). Suicide cases represent a subcategory of custodial relationships, because hospitals undertake the duty of confining patients for the purpose of preventing the particular act of suicide. *See generally Myers v. County of Lake, Ind.*, 30 F.3d 847, 853 (7th Cir. 1994); *Sauders v. County of Steuben*, 693 N.E.2d 16, 19–20 (Ind. 1998); *DeMontiney v. Desert Manor Convalescent Ctr., Inc.*, 695 P.2d 255 (Ariz. 1985); *Cole v. Multnomah County*, 592 P.2d 221 (Or. Ct. App. 1979).

to their patients. The New Horizons Unit was a locked ward. The renovation of the facility balanced safety measures with the goal of providing a therapeutic environment. CCHCC had a policy in place for patients that presented a suicide or elopement risk. To find that CCHCC owed a heightened duty to Jankee in particular, however, we must answer the question whether CCHCC had notice of Jankee's disposition to escape or commit suicide. *See Dahlberg*, 232 Wis. 2d at 11; *Bogust*, 10 Wis. 2d at 139–40.

¶ 100. Like other mentally disabled patients, Jankee's history was complicated. He apparently attempted suicide as an adolescent. Although Jankee had threatened escape or suicide during his first 1984 hospitalization at Norwood, he denied feeling suicidal when he was again admitted to Norwood in July 1984. During that confinement, Jankee admitted to having had suicidal thoughts, but countered that suicide was not an option, adding that he could not follow through with such an act.

¶ 101. CCHCC viewed Jankee as neither a suicide nor an elopement risk during any part of the July 1989 hospitalization.[37] Jankee was, according to his

---

[37] The dissent suggests that Jankee could have proved at trial that the County was negligent in failing to protect Jankee from acting out his irrational impulses. Dissent at ¶ 110. We respectfully disagree. Requiring a facility to be liable for any irrational behavior would impose an unreasonable burden on the County and frustrate the objective of providing patients with a therapeutic environment free from prison-like restrictions. Although the County, as the dissent points out, was aware of Jankee's general history, the County had before it information to suggest that Jankee was no longer a suicide risk or an elopement risk. By contrast, in *Fatuck v. Hillside Hosp.*, 45 A.D.2d 708 (N.Y. App. Div. 1974), *aff'd without op.*, 328

own medical expert, "sensitive to wanting to survive," and he was "not someone [ ] intent on harming himself." Jankee made no threats of self-injury or escape while at CCHCC. The hospitalization at CCHCC was the product of a domestic abuse incident—not because Jankee was a danger to himself. The emergency detention was designed to monitor his aggressive behavior towards others. Physician reports show that Jankee posed a danger to his wife, not to himself. On the contrary, Jankee expressed anticipation about resuming his life and his new marriage, and he asserted that because of his religious faith, he could not harm either his wife or himself.

¶ 102. Jankee had no history of escape attempts, and he expressed no thoughts of elopement during his confinement at CCHCC. CCHCC evaluated Jankee and found no reason to presume that he was likely to escape. CCHCC has a system in place to check on patients who were an elopement risk, and records fail to show that that risk applied to Jankee. Although Jankee told staff the night of his escape, "I'm tired of being used for a guinea pig around here. Why don't you

N.E.2d 791 (N.Y. 1975), one of the cases upon which the dissent relies, there were notations in the hospital records that the patient expressed suicide threats. Moreover, the patient had been placed on 15-minute checks, and there is no indication that the defendant hospital carried out those checks. Similarly, in *Mounds Park Hosp. v. Von Eye*, 245 F.2d 756, 760–61 (8th Cir. 1957), the court noted that persons with that patient's condition "are subject to unpredictable sudden impulses, such as jumping from windows in escape reactions." Moreover, the patient in *Mounds Park* grew increasingly hostile in the days before her escape. *Id.* at 761. Finally, when the patient escaped, she walked from her room through a corridor in which no nurses stood watch and entered an unsecured obstetrics ward from which she escaped.

kick my ass out of here instead of giving me a bunch of medication," the statement did not serve to alert CCHCC that Jankee would injure himself in an attempted elopement from a third floor window.

██

¶ 103. Therefore, we cannot bind Clark County to assume Jankee's own duty of self-care. Although Clark County established a special relationship with Jankee when the court confined Jankee to the facility in an involuntary commitment, there is no cause of action here because CCHCC did not have notice about Jankee's disposition toward escaping. Accordingly, we hold that Clark County was not negligent during the course of its custodial care of Jankee.

## CONCLUSION

¶ 104. We hold that Jankee was, as a matter of law, contributorily negligent for the injuries he sustained during his escape attempt from CCHCC and that his negligence exceeded the negligence of any defendant. First, Jankee's illness was treatable and foreseeable, not the product of sudden mental illness. Second, Jankee was able to appreciate the duty of ordinary care when he made his escape, and he was the major cause of his own injuries.

¶ 105. We further observe that although Clark County entered into a special relationship with Jankee during his confinement, it cannot be held negligent for the harm resulting from the elopement because Jankee's escape was not foreseeable. We do not reach the issue of whether the government contractor immunity defense protects HGA, Cullen, and MILCO from liability because we find the contributory negligence issue dispositive in this case.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 106. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE (*dissenting*). Courts and commentators continue to struggle to develop an appropriate standard of care for persons with mental illness or mental disabilities. No proposed standard is free of difficulties.

¶ 107. I first address the liability of Clark County. This case presents a recurring fact pattern: A plaintiff, here Emil Jankee, is diagnosed with a mental illness or mental disability and poses a danger to himself or to others. The plaintiff is involuntarily institutionalized in a county facility. The plaintiff is injured while he is institutionalized and claims that the County's negligence caused his injury.

¶ 108. As the majority correctly explains, under these circumstances, Clark County assumed the duty to provide reasonable care to shield the plaintiff—the protected person—from foreseeable harm while he was at the county facility. Majority op. at ¶¶ 91, 92.[1] The majority opinion makes clear that the County's assumption of this duty may absolve Jankee, the protected person, from the ordinary obligation of self-care, and to shift responsibility to the County, thereby expunging the affirmative defense of contributory negligence. Majority op. at ¶ 92. The reason for this rule is that "[t]he improper or inappropriate imposition of the

---

[1] *See Kujawski v. Arbor View Ctr.*, 139 Wis. 2d 455, 462–63, 407 N.W.2d 249 (1987) ("The general rule in Wisconsin is that a hospital must exercise such ordinary care as the mental and physical condition of its patients, known or should have been known, may require.").

defense of contributory negligence can lead to the dilution or diminution of a duty of care."[2]

¶ 109. I agree with the majority's analysis up to this point. But the majority then goes too far in the present case, which is here on summary judgment. The majority weighs the conflicting evidence and concludes that the County was not negligent during its custodial care of Jankee because it could not have foreseen that Jankee would attempt to escape. Majority op. at ¶¶ 99–103, 105. I disagree with the majority's conclusion. Given Jankee's extensive history of mental illness, including his violent and irrational tendencies, which were known to the County, it is entirely possible

---

[2] *Cowan v. Doering*, 545 A.2d 159, 167 (N.J. 1988) (adopting a capacity-based standard for evaluating contributory negligence but holding that contributory negligence could not be asserted in this case because the hospital's duty of care included the prevention of the kind of self-damaging acts that caused plaintiff's injuries, thus, "the plaintiff's actions and capacity were subsumed within the defendant's scope of duty").

*See* W.C. Crais III, Annotation, *Contributory Negligence of Mentally Incompetent or Mentally or Emotionally Disturbed Persons*, 91 A.L.R. 2d 392 at 397 (1963 & 2000 Supp.), stating that:

> In these cases, [where the plaintiff is in an institution for the mentally ill] considerable emphasis is placed on the overriding duty arising from the hospital-patient relationship, resulting in a good deal more lenience toward the plaintiff insofar as his duty to himself is concerned (discussing cases).

*See also* James L. Rigelhaupt, Jr., Annotation, *Hospital's Liability for Patient's Injury or Death Resulting from Escape or Attempted Escape*, 37 A.L.R. 4th 200 at 274–77 (1985 & 1999 Supp.) (discussing cases allowing the jury to decide whether a mentally ill patient injured in an escape or suicide attempt was contributorily negligent according to a subjective standard of plaintiff's capacity).

that Jankee could prove at trial that the County was negligent in failing to protect Jankee from acting out his irrational impulses, including trying to escape.[3]

¶ 110. Even if the facts and the reasonable inferences to be drawn from the facts were not in dispute, foreseeability and negligence are ordinarily questions for a fact-finder, not for a court on summary judgment. *Schuh v. Fox River Tractor Co.*, 63 Wis. 2d 728, 744, 218 N.W.2d 279 (1974).[4]

---

[3] *See* James L. Rigelhaupt, Jr., Annotation, *Hospital's Liability for Patient's Injury or Death Resulting from Escape or Attempted Escape*, 37 A.L.R. 4th 200 at § 3.a (1985 & 1999 Supp.) (discussing cases allowing jury to decide whether hospital was negligent in its treatment and supervision of mentally ill patients injured when attempting to escape).

A case strikingly similar to the present case is *Fatuck v. Hillside Hospital*, 45 A.D.2d 708 (N.Y. App. Div. 1974), *aff'd without op.*, 328 N.E.2d 791 (N.Y. 1975). In *Fatuck* the court held that there was sufficient evidence to establish prima facie negligence on the part of a hospital when plaintiff claimed that the hospital was negligent in failing to prevent the decedent from "escaping" from the hospital. The court pointed out that the patient had more than a 14-year history of mental problems and had been admitted to and released from several hospitals in the past. However, at no time during any of the hospitalizations did the patient exhibit any escapist behavior or attempt to commit suicide.

*See also Mounds Park Hosp. v. Von Eye*, 245 F.2d 756 (8th Cir. 1957) (a hospital on notice that mentally ill plaintiff resented her confinement and had expressed her desire to get away was sufficient evidence to sustain the jury's finding of the hospital's negligence when mentally ill plaintiff injured herself in an escape attempt).

[4] *See also Kull v. Sears, Roebuck & Co.*, 49 Wis. 2d 1, 11, 181 N.W.2d 393 (1970) ("the issue of contributory negligence is peculiarly one for the jury, and it normally cannot be said as a matter of law that a plaintiff was or was not guilty of contribu-

¶ 111. Therefore, summary judgment is not appropriate in this case. The determination of the County's negligence should be made by the trier of fact, and the cause should be remanded to the circuit court.

¶ 112. Because the majority holds that Clark County was not negligent as a matter of law, Jankee's contributory negligence is of no import in determining the County's liability.

¶ 113. As to the other defendants, the majority opinion does not determine each defendant's individual causal negligence. Perhaps like the County, each of the other defendants was not causally negligent. The majority looks only to Jankee's negligence and concludes that Jankee's contributory negligence outweighs the negligence of each of the defendants.

¶ 114. The majority uses an objective standard for determining Jankee's contributory negligence: Jankee, an institutionalized injured person suing the institution and others for negligence, is held to a reasonable-person standard of care in determining his contributory negligence.[5]

tory negligence once the issue is raised"); *Davis v. Skille*, 12 Wis. 2d 482, 489, 107 N.W.2d 458 (1961) ("The comparison of negligence is peculiarly within the jury's province. . . .While this court has in a number of cases determined as a matter of law that the negligence of a plaintiff equaled or exceeded that of one or more defendants, it has also stated that the instances in which a court can so rule will be extremely rare.").

[5] The court of appeals in the present case adopted the following rule barring contributory negligence under limited circumstances: A person who is involuntarily institutionalized with a mental illness or mental disability on the ground that he or she is dangerous to himself or herself and others and who does not have the capacity to control or appreciate his or her conduct because of that illness or disability is not barred by contributory negligence when that person claims that the insti-

¶ 115. The majority's treatment of the mentally ill or mentally disabled is in stark contrast with the law's treatment of physically disabled defendants: When a person "is ill or otherwise physically disabled, the standard of conduct to which he must conform to avoid being negligent is that of a reasonable person under like disability." Restatement of Torts (Second) § 283C (1965).[6]

¶ 116. The majority opinion acknowledges that the objective standard is a minority view. Most states allow a jury to weigh degrees of mental capacity in assessing whether an injured plaintiff was contributorily negligent. Majority op. at ¶ 73 and n.21.[7] Case

---

tution's failure to maintain a safe place and negligent supervision caused the institutionalized person injury. The court of appeals remanded the cause to the circuit court for a factual finding to determine whether Jankee possessed the capacity to control and appreciate his conduct. *Jankee v. Clark County*, 222 Wis. 2d 151, 177–78, 588 N.W.2d 913 (Ct. App. 1998).

[6] The standard of care ordinarily applied to children is to measure the child's conduct against what would be reasonable to expect of a child of like age, intelligence, discretion, knowledge and experience under the same or similar circumstances. Restatement of Torts (Second) §§ 283A, 464(2) (1965); Wis JI-Civil 1010.

[7] *Birkner v. Salt Lake Cty.*, 771 P.2d 1053, 1060–61 (Ut. 1989) ("In contrast to the use of an objective standard in cases of primary negligence, the majority of courts have adopted a more compassionate stance regarding the contributory negligence of the mentally impaired. Those who are insane are incapable of contributory negligence, whereas lesser degrees of mental impairment should be considered by the jury in determining whether the plaintiff was contributorily negligent. . . .This rule has also been applied in comparative negligence jurisdictions. . . .A patient seeking professional help for a certain kind of

767

law from other states and several commentators agree that a subjective standard of care is particularly well suited in cases like this one, where the defendant is aware of the plaintiff's mental illness and can take appropriate precautions. *See Prosser & Keeton on the Law of Torts*, § 32, at 138 and § 135, at 1073 (5th ed. 1984).

¶ 117. The majority fully and fairly presents reasons for and against the objective and subjective standards. I need not repeat them. I am persuaded by the case law and the commentators that recognize that the policy arguments employed to justify holding an institutionalized mentally ill or mentally disabled per-

---

disorder may be more or less negligent depending on the nature and extent of the disorder. . . .To apply a categorical rule that no patient seeking therapy for a mental or emotional disorder can be charged with negligence would be unrealistic and cause damage to the principle of comparative negligence") (citing cases).

*See also Mochen v. State of New York*, 43 A.D.2d 484, 487–88 (N.Y. App. Div. 1974) (a plaintiff with mental illness or mental disability should be held to exercise his or her own faculties; with the present state of medical knowledge "it is possible and practical to evaluate the degrees of mental acuity and correlate them with legal responsibility").

*See* W.C. Crais III, Annotation, *Contributory Negligence of Mentally Incompetent or Mentally or Emotionally Disturbed Persons*, 91 A.L.R. 2d 392 at 397–98 (1963 & 2000 Supp.) stating that "a majority of courts have adopted the. . .view, however, that a plaintiff should be held to exercise only that degree of care for his own safety consonant with the faculties and capacities bestowed upon him by nature." The author also states:

Under the weight of scientific opinion, however, the view that only total insanity may be considered is buckling. Most successful in overcoming the argument that it is impracticable to consider the lesser deficiencies is the argument that insanity is analogous to infancy and should be treated similarly by the courts (citing cases).

son to an objective reasonable person standard when that person sues the institution for negligent care "lose much of their force" when applied to the institutionalized person in the contributory negligence arena. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 32, at 178 (5th ed. 1984).[8]

¶ 118. For the reasons stated, I dissent.

¶ 119. I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.

---

[8] I do not address the issue of the government contractors' immunity because such a discussion is of limited value under the circumstances of the present case. The majority does not address the issue of immunity, and the precedential value of a decision of the court of appeals which this court has reviewed is an open question.